OPINION
{¶ 1} In this case, National City Bank (NCB) appeals from a trial court decision finding that NCB breached a contract with Rejas Investments. After a non-jury trial, the court awarded Rejas $434,218.47, plus interest. Because we find reversible error on the part of the trial court, the judgment will be reversed and this case will be remanded for further proceedings.
 I {¶ 2} Rejas is a partnership consisting of Norma Kaplan and Barbara Katz, who had owned about 75 acres of property on Infirmary Road in West Carrollton, Ohio since the 1970s. When Norma and Barbara acquired the Infirmary Road property, they leased it to Pennsylvania Iron and Coal (Penn), which was a scrap operating facility. Penn's owners, Elwood Kaplan and Lawrence Katz, were the spouses of Norma and Barbara. Penn processed scrap, operated a coal briquetting company, and brokered scraps to consuming mills and foundries.
 {¶ 3} In the early 1990s, Penn ceased operations. On August 12, 1992, Penn sold physical equipment to Counselor Leasing Co., including a hot briquetter, a crusher, and additional items listed on Exhibit A to the purchase agreement. The purchase price was $675,000. The items that were purchased included a dryer (also known as a kiln), a bag house, and other miscellaneous equipment. The bag house in question (known as the large bag house) was installed in the 1980s and was one of two bag houses on the property. The other bag house (known as the small bag house) was installed in the mid-1970s, and is not specifically mentioned in the purchase agreement, although one of Penn's owners, Lawrence Katz, indicated that it was included as part of the sale, as miscellaneous equipment.
 {¶ 4} The kiln is ten feet in diameter and about forty-five feet long, and is one piece of about seven or eight major components that produce cast iron briquettes. During production, borings enter the kiln and are heated while the kiln rotates. After the borings are heated, they become soft and drop down into a roll briquetter. The briquetting process generates dust, which is conveyed to the bag house, where the dust is collected in bags. The bags are then shaken, and dust falls into a trough. Ultimately, the dust is conveyed to tanker trucks and is used to make cement.
 {¶ 5} Because the kiln rotates, it is not anchored. The kiln sits on rollers and turns with the rollers. The cradle in which the kiln sits is bolted to large concrete piers or pylons that are about fifteen feet high, and are cast in place. Similarly, the large bag house is bolted to concrete piers, and the piers are supported by sub-grade footers. The large bag house originally cost about $1,200,000, including erection costs, and consists of six very large modules that are fastened to each other. These modules were originally transported to the Infirmary Road property on flatbed trailers.
 {¶ 6} On August 13, 1992, Counselor Leasing sold the equipment to Counselor Material Processing, Inc. (Counselor). Counselor originally intended to move the equipment to another site, and did not enter into a lease agreement with Rejas. However, the equipment was never moved, and Penn sublet the property to Counselor. On January 1, 1994, Counselor and Rejas entered into a lease agreement for a period of three years, renewable for five additional terms of three years on the same terms and conditions. The base rent was $8,000 a month, plus additional rent for all real estate taxes, assessments, and utilities accruing during the lease term. Counselor was responsible for routine maintenance of the interior and exterior of the premises, and Rejas was responsible for non-routine maintenance, or repairs in excess of $500. Counselor was also given the right to sub-let any or all of the premises without prior approval from Rejas. The agreement contained conditions of default, including bankruptcy, remedies for default, and an integration clause prohibiting modification of the agreement absent a writing signed by the parties.
 {¶ 7} Counselor continued to occupy the premises, and exercised the lease option twice, which extended the lease term until December 31, 2001. However, on March 22, 2001, Counselor filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Ohio, Western Division. Prior to that time, on December 30, 1996, Counselor had obtained a $1,500,000 loan and a $500,000 line of credit from NCB. On April 16, 2001, NCB filed a motion for relief from the bankruptcy stay. In the motion, NCB claimed that Counselor owed $394,798.81 on the loan, and $321,584.99 on the line of credit, plus interest from March 3, 2001. NCB attached copies of various documents, including: commercial installment and demand notes signed by Counselor; a security agreement dated December 30, 1996; and Uniform Commercial Code (UCC) 1 financing statements filed with the Montgomery County Recorder and Ohio Secretary of State in January, 1997. NCB also indicated in the motion that it possessed a lien on Counselor's personal property, or "collateral," and that the appraised value of the collateral was $$262,550.
 {¶ 8} Rejas was not listed as a creditor on Counselor's bankruptcy schedule, but was listed as a party having an unexpired non-residential real property lease. On April 26, 2001, Rejas also filed a motion for relief from the bankruptcy stay, and asked that it be allowed to pursue state court remedies to recover possession of the leased premises. This motion was granted on May 31, 2001. Ira Rubin, the attorney for Rejas, subsequently served a three-day notice on Counselor, but then concluded that no further action was needed, because Counselor had already vacated the premises.
 {¶ 9} Before this time, NCB had asked Wilson Auction and Realty Company to take possession of Counselor's personal property and arrange an Article 9, secured party sale of the assets. Based on information from NCB, Brent Wilson, of Wilson Auctioneers, contacted Counselor's former general manager, Ernie Spicer, to ask what equipment Counselor possessed. Wilson testified that NCB did not tell him what items were considered collateral. In early March, 2001, Spicer sent Wilson a list of Counselor's major items of equipment and assets. The list included items like a 350 ton briquetter, two bucket elevators (that were 82 feet high), various conveyors, a crusher, a stacker, fairly new digital scales for weighing trucks, and the kiln. However, the large bag house and small bag house were not on the list.
 {¶ 10} Ira Rubin subsequently received a phone call from Loretta Wiley, an attorney for NCB, who said that NCB wished to conduct an Article 9 sale at the premises. Rubin told Wiley that could be arranged as long as NCB paid rent. An inspection then took place at the Infirmary Road premises on May 23, 2001, which Rubin and Wilson attended. Also present was Lou Collier, a former Penn employee who had keys to the premises and who had been helping the Kaplans and Katzes. Notably, when Rejas regained possession of the premises, Rejas had placed its own lock on the gate to the property.
 {¶ 11} During the inspection, Rubin, Wilson, and Collier walked the facility and more of a list was made. Wilson testified that Rubin asked how the kiln, bag houses, and truck scales could be sold since they were attached to the property. Wilson responded that these were fixtures to a business. In contrast, Rubin denied that Wilson or anyone from NCB had ever said the bag house or kiln were fixtures. In fact, Rubin denied having a discussion with NCB or Wilson before the eventual auction about whether the kiln and bag house were personal property or fixtures.
 {¶ 12} After the inspection, Wiley sent Rubin a letter outlining the materials that would be auctioned. Included were the briquetter, kiln, bucket elevators, truck scales, various other specific items, and "all other personal property of Counselor" secured by NCB. Again, the bag houses were not mentioned. Rubin testified that he viewed the collateral as including everything that was on the property that was not in the nature of real estate, because that is what Penn sold to Counselor.
 {¶ 13} On June 21, 2001, Rubin wrote to Wiley, stating that the truck scales were permanently attached to the real estate and constituted a "fixture." Therefore, Rejas would not permit NCB to remove the truck scales. Rubin then said that: "It appears that the remaining equipment set forth in your letter is movable and awaits disposition by your client." Rubin went on to say that NCB could not continue to store collateral without paying storage charges. In this regard, Rubin stressed that unless satisfactory arrangements were made, or the collateral was removed before July 3, 2001, Rejas would deem the collateral "abandoned" and would dispose of it as Rejas saw fit.
 {¶ 14} On July 6, 2001, Wiley sent Rubin a proposed agreement, which was the same as the final agreement adopted, with the exception of an indemnification clause that was subsequently added at Rubin's request. The preamble of the executed contract stated that:
 {¶ 15} "THIS AGREEMENT is made this 20th day of July, 2001, by and between National City Bank (`NCB') and Rejas Investments (`Rejas'), for the payment of storage charges by NCB to Rejas, for the time period in which the collateral of NCB (`Collateral') is located at the manufacturing facility owned by Rejas and formerly operated by Counselor Material Processing, Inc. (`CMP'), situated and described as 4634 Infirmary Road, Miamisburg, Ohio (`Premises')."
 {¶ 16} The contract did not define "collateral," nor did it outline the parameters of the "manufacturing facility" owned by Rejas. The remaining paragraphs of the contract provided that:
 {¶ 17} "1. NCB will pay to Rejas the sum of Nine Thousand Dollars ($9,000.00) for storage of its Collateral for the period of July 1, 2001 through July 21, 2001);
 {¶ 18} "2. NCB will pay to Rejas the sum of $9,000.00 for storage of its Collateral for the period of August 1, 2001 through August 31, 2001;
 {¶ 19} "3. Thereafter, NCB will pay Rejas at the rate of Two Hundred Ninety and 32/100 Dollars ($290.32) per day until NCB or its designee completes the removal of NCB's collateral from the premises. NCB will provide Rejas with written notice promptly upon the complete removal of NCB's collateral from the premises;
 {¶ 20} "4. Rejas agrees to permit NCB and its designees access to the Premises for the purpose of conducting a public auction in order to liquidate the Collateral;
 {¶ 21} "5. In the event that any items sold by NCB at said auction have not been removed from the Premises by the purchaser by the date of the written notice described in Paragraph 3 above, the removal and/or storage charges for same will become the responsibility of the purchaser as of that date;
 {¶ 22} "6. In the event that any amount is received by Rejas from any other entity for storage of property at the premises, Rejas will reduce the above-stated charges to NCB proportionately;
 {¶ 23} "7. The only charges NCB will pay to Rejas are those specifically set forth in this agreement.
 {¶ 24} "8. NCB agrees to indemnify and hold Rejas harmless from any claims, judgments or damages or damage arising from acts or omissions by NCB or its agents, servants, employees or invitees relating to their use of the premises or the storage of NCB's collateral, during the term of this agreement;
 {¶ 25} "9. This Agreement does not represent a continuation of the lease of the Premises to CMP and Rejas agrees that NCB does not assume liability for the lease obligations of CMP."
 {¶ 26} On July 25, 2001, Wiley sent the final signed contract to Rubin, who signed the contract on behalf of Rejas. NCB then paid Rejas $9,000 for the July charges on July 31, 2001, and $9,000 for August, on August 6, 2001.
 {¶ 27} The auction was scheduled for September 26, 2001, and NCB paid another $9,000 for September, on September 13, 2001. Before the auction, Wilson sent out advertisements for the sale. The briquetter, kiln, and bucket elevators were listed on the advertisement, but the bag houses were not listed. The terms of the auction were that when the gavel "went down," the item was sold. A letter addressed to registered bidders stated that bidders were to remove smaller items by September 28, 2001, and that everything must be removed by October 15, 2001. The letter further said that if purchases were left after October 15, the bidder must make arrangements with the building owner for storage, rental, and removal fees. In addition, the letter stated that all items were sold "as is — where is" and "with all faults." Rubin received a copy of this information from Wilson.
 {¶ 28} Before the auction, Wiley sent Rubin a letter dated September 21, 2001, including a proposed agreement to "extend term," which Wiley labeled as an attachment to the original agreement, rather than a new agreement. The proposed agreement stated that NCB would pay storage charges of $9,000 for September, and would pay $290.32 per day thereafter until the earlier of: the date upon which NCB or its designee removed NCB's collateral, or October 15, 2001. Rubin told Wiley that Rejas would not sign this agreement.
 {¶ 29} The auction took place on September 26, 2001, as scheduled. Wilson testified that Rubin, Collier, and Lawrence Katz were at the auction, and that Rubin introduced him to Katz. In contrast, Rubin denied being at the sale. However, there is no dispute about the fact that Lawrence Katz, Collier, and Elwood Kaplan attended.
 {¶ 30} No one from Rejas told Wilson not to offer the bag house, even though it had not been not listed in the advertisement. Bidder #12 placed a $50 bid on the large bag house. Wilson testified that after he dropped the gavel, Katz said that he did not want to sell because the bag house had to be removed consistent with EPA regulations, and Katz was not sure the buyer would do this. Wilson then told bidder #12 that the landlord had requested that the bag house not be sold. The buyer agreed, and Wilson put a "no sale" on the item. Katz admitted telling Wilson that the purchaser of the bag house should observe EPA regulations, but Katz denied canceling the sale.
 {¶ 31} Other items did not sell, including: the kiln, the small bag house, two 82 foot bucket elevators, a couple of freight train cars, an auger, three conveyers, an air-conditioning unit, and a substantial amount of office equipment, including items like desks, file cabinets, tables, a copier, and the contents of the conference room and another room. NCB received net proceeds of $24,745, after deduction of advertising and labor expenses.
 {¶ 32} Wilson testified that the auction was well attended for this type of sale, but that there was a change in the amount of bidders and bidding as the auction went on. People who came to many of Wilson's auctions to buy steel for scrap would not bid, and Wilson found that odd. Wilson observed Rejas representatives having conversations with people at the auction. Subsequently, Wilson wrote Wiley a letter on November 9, 2001, stating that:
 {¶ 33} "The landlord was present during the entire auction and had conversations with some of the bidders. We understand that he negotiated a deal with one of the bidders to come in and clean up what was abandoned and left over from the auction, [sic] because of this agreement, the bidder stopped bidding buying through the auction process. This caused prices to drop more than they already were."
 {¶ 34} Katz admitted having conversations with scrap dealers at the auction, but denied that anything relevant was discussed. In this regard, the following exchange occurred during the cross-examination of Katz:
 {¶ 35} "Q. Okay. While you were there, during the auction, did you meet any scrap dealers?
 {¶ 36} "A. Yes.
 {¶ 37} "Q. People that you'd already known?
 {¶ 38} "A. Yes.
 {¶ 39} "Q. Did you have a conversation with them during the auction?
 {¶ 40} "A. They were just remarking — flattering me, telling me how big of an operation is was and how big it was, and one thing and another. It was meaningless information."
 {¶ 41} When the auction was over, Wilson left the property, locked the gate, and walked away. The sale lasted only one day, and buyers were given only a week to remove the property. At that time, the property would be considered abandoned, because Wilson would not be allowed back on the property. In a proffer, Wilson testified that the typical procedure in Article 9 auctions is that the secured party abandons the property that is not sold and any remaining property becomes part of the landlord's ownership.
 {¶ 42} On October 15, 2001, Wiley sent Wilson a letter, confirming their telephone conversation, in which Wilson had said that all items of collateral, other than items sold at auction, were removed from the facility as of October 12, 2001. On October 16, 2001, NCB notified Rubin that all of NCB's collateral had been removed as of October 12, 2001, and that any items sold at auction that had not been removed as of that date, were the responsibility of the purchaser. NCB enclosed a check for $3,483.84, as final payment.
 {¶ 43} The previous day, Rubin had sent Wiley a letter indicating that items of NCB's collateral, including the kiln and bag house, had not been removed from the property. Rubin enclosed an invoice for $4,354.80 for the first fifteen days of September, which was clearly a mistake, as payment for September had already been received. Instead, this invoice would have been for the first fifteen days of October. Rubin stated that Rejas would bill NCB at $290.32 per day until the items were removed.
 {¶ 44} As we mentioned, Wilson wrote to Wiley on November 9, 2001, about oddities that occurred during the auction. Subsequently, Wiley sent Rubin a letter, dated November 12, 2001, claiming that any items remaining at the property, including the kiln and bag house, were attached to the realty. Wiley stated that under NCB's security agreement with Counselor, items attached to real estate or any fixtures located on real estate were excluded from collateral. Wiley also mentioned the fact that Rejas had approached the purchaser of the bag house to request that it not be moved. Finally, Wiley stated that NCB had no obligation to pay storage charges after October 12, 2001.
 {¶ 45} Rejas filed suit against NCB on December 21, 2001, claiming that the storage agreement was to continue until NCB removed collateral from the premises, and that NCB had failed to remove a kiln and dust collector bag house. In its answer and counterclaim, NCB claimed laches and unclean hands, and asserted that the kiln and bag house were fixtures. NCB later amended its counterclaim to allege the defense of accord and satisfaction.
 {¶ 46} In response to an interrogatory request for a list of "any and all items" that Rejas claimed NCB was obligated to remove from the premises, Rejas listed only two items: the kiln and large bag house. Moreover, in response to a question about the basis of the claim that NCB had collateral on the premises after October 1, 2001, Rejas answered that its claim was based on the continued presence of the kiln and bag house.
 {¶ 47} NCB filed a motion for summary judgment, claiming that the kiln and bag house were fixtures. Subsequently, the case was referred to a magistrate, who denied the motion for summary judgment on June 18, 2003. Among other things, the magistrate concluded that the kiln and bag house were not fixtures.
 {¶ 48} The magistrate then held a trial on November 19 and 20, 2003. The trial did not conclude on those days, and further evidence was received on May 6 and 7, 2004. Before the first trial date, NCB filed a pretrial statement raising "affirmatively," the fact that Rejas was not the owner of the premises, that Rejas had failed to mitigate its damages, and that Rejas had unclean hands. NCB also discussed the issue of abandonment of the collateral at pages five and six of its pretrial statement, and discussed mitigation in some detail at page eight. Neither party's pretrial statement discussed parol evidence.
 {¶ 49} Any discussions at pre-trials were not recorded, and the parties did not make opening statements at the trial. At the initial hearing, Rejas presented testimony from Lawrence Katz, Ira Rubin, and Mark Prigozen, an engineer who had worked for Counselor between 1973 and 1977. Rejas' case was interrupted briefly so that Brent Wilson could testify out of order. Rubin was the last individual to testify, and during his cross-examination, the magistrate recessed the proceedings in mid-afternoon.
 {¶ 50} Shortly thereafter, NCB filed a motion to recuse the magistrate. The motion was supported by five affidavits, which alleged that the magistrate had made comments indicating that she had prejudged the case and was not being objective. Opposing counsel and the magistrate also filed affidavits, disputing the bias claims. The trial court subsequently overruled the motion to recuse, and the matter was set for further trial before the magistrate on May 6 and 7, 2004.
 {¶ 51} After the second round of hearings, the magistrate issued a decision on November 28, 2004, finding that NCB had breached the contract and that Rejas was entitled tor recover $290.32 per day from October 1, 2001, the date of breach. NCB filed objections to this decision, raising thirty-five specific objections. Rejas objected solely to the magistrate's method of calculating prejudgment interest. On May 13, 2005, the trial court overruled NCB's objections to the magistrate's decision, but did not rule on the objection to the interest rate. The court later filed an amended entry awarding judgment to Rejas in the same amount as had been previously ordered, but with interest accruing at the rate specified in the objection Rejas had made. Accordingly, the court apparently sustained the objection without specifically saying so.
 {¶ 52} NCB also filed a motion for new trial, which was denied by the trial court on August 5, 2005. NCB then timely appealed, and now raises the following assignments of error:
 {¶ 53} "I. The trial court committed reversible error when it effectively converted a short term storage agreement into a long term lease providing a windfall for the plaintiff.
 {¶ 54} "II. The trial court committed reversible error when it ruled that the Kiln and Second Bag house were `collateral' under the agreement.
 {¶ 55} "III. The trial court committed reversible error when it denied the Bank's motion to recuse the magistrate and this error resulted in an unfair trial.
 {¶ 56} "IV. The trial court committed reversible error when it relied on the transcript and decisions made by the magistrate.
 {¶ 57} "V. The trial court committed reversible error when it awarded Plaintiff a windfall in the amount of $434,218.47 plus interest."
 II {¶ 58} Before specifically discussing the assignments of error, we should point out that one of the primary disputes in this case, if not the main dispute, involves the magistrate's decision to reject parol evidence. As has often been observed, the parol evidence rule:
 {¶ 59} "is not really a rule of evidence but instead is a rule of substantive law designed to protect the integrity of final, written agreements. * * * If contracting parties integrate their negotiations and promises into an unambiguous, final, written agreement, then evidence of prior or contemporaneous negotiations, understandings, promises, representations, or the like pertaining to the terms of the final agreement are generally excluded from consideration by the court. * * * This rule is not confined to excluding merely parol communications; it excludes contrary written communications as well." Busler v. D H Mfg.,Inc. (1992), 81 Ohio App.3d 385, 390, 611 N.E.2d 352 (citations omitted).
 {¶ 60} The magistrate found that the contract was unambiguous, and prevented NCB from presenting any extrinsic evidence about negotiations or the purpose of the contract. At the same time, Rejas' agent, Rubin, was permitted to testify about his own understanding of the meaning of contract terms as well as negotiations and documents outside the four corners of the contract.
 {¶ 61} Construction of written contacts is "a matter of law to be resolved by the court," and the court's decision is reviewed de novo. Lovewell v. Physicians Ins. Co. of Ohio,79 Ohio St.3d 143, 144, 1997-Ohio-175, 679 N.E.2d 1119. After reviewing the contract in this case, we find that it is ambiguous, and that NCB should have been permitted to introduce parol evidence.
 {¶ 62} As we mentioned, the beginning clause of the contract states that the agreement is made "for the payment of storage charges by NCB to Rejas, for the time period in which the collateral of NCB (`Collateral') is located at the manufacturing facility owned by Rejas and formerly operated by Counselor Material Processing, Inc." The contract does not specifically define the meaning of the word collateral, and the trial court and Rejas both relied on Rubin's "understanding," of contract terms, extrinsic documents, and negotiations between the parties to define what items would be considered collateral. However, if the contract terms were unambiguous, there would be no need to resort to such evidence. Furthermore, since Rejas was allowed to present extrinsic evidence on this point, NCB should have been allowed to introduce similar evidence about negotiations.
 {¶ 63} The position that Rejas and its sole negotiator, Rubin, took in the trial court was that NCB's collateral included everything that was on the property that was not in the nature of real estate, because that is what Penn sold to Counselor. However, this claim is belied by the wording of the contract itself, which states that NCB's collateral is "located at themanufacturing facility owned by Rejas and formerly operated byCounselor" (emphasis added). The contract does not define the term "manufacturing facility," but common sense indicates that a set of truck scales and the land itself (75 acres owned by Rejas) would not be considered a "manufacturing facility." See, e.g.,Howard v. Jet Corr Classic, Inc., Clark App. No. 05CA0068,2006-Ohio-415, at ¶ 2 (plaintiff was injured by band saw in defendant's "manufacturing facility"); Chansky v. WhirlpoolCorp. 164 Ohio App.3d 641, 642, 2005-Ohio-6397, 843 N.E.2d 833, at ¶ 6 (plaintiff was injured when he stepped on a metal shard at Whirlpool's "manufacturing facility"); and Vickers v. WrenIndustries, Inc., Montgomery App. No. 20914, 2005-Ohio-3656, at ¶ 12 (noting that defendant operated a tool and die "manufacturing facility," whose workforce was separated into two divisions, the "die side," and the "detail side").
 {¶ 64} A "facility" is "something * * * that is built, installed, or established to serve a particular purpose." Merriam-Webster's Collegiate Dictionary (1993) 416. A "manufacturing facility" would thus be something built, installed or established to manufacture a product — in this case, briquettes and their by-products. It is not land and a set of scales. While Chap. 5709 of the Ohio Revised Code, which governs taxable property and exemptions, is obviously not binding on the parties as far as the present contract is concerned, that chapter does define a "facility" for purposes of an enterprise zone as "an enterprise's place of business in a zone, including land, buildings, machinery, equipment, and other materials, except inventory, used in business." R.C. 5709.61(C). Rejas helped draft the contract and could have changed or added language, as it did with the paragraph on indemnification. The fact that Rejas chose to refer to itself as the owner of the manufacturing facility is inconsistent with the claim that NCB's "collateral" included everything on the property other than the truck scales.[1]
Accordingly, the contract is ambiguous, due to Rejas's own classification of its status and the failure to define collateral, by reference or otherwise.
 {¶ 65} The magistrate also erred in refusing to allow evidence of custom and practice in Article 9 secured party sales. From what little testimony was permitted, it is clear that the parties contracted with this custom and practice in mind. For example, Rubin testified that when he was first contacted by NCB's attorney, he was told that NCB wished to conduct an "Article 9 UCC sale" at the premises. Rubin's testimony also reveals that he is an attorney who is well experienced in Uniform Commercial Code law and transactions. This was not a situation where a commercial entity contracted with a landlord who was ignorant of commercial practices. However, the magistrate cited the parol evidence rule and refused to let NCB present evidence from the auctioneer and NCB's representative about custom and practice in these types of sales.
 {¶ 66} NCB did proffer evidence indicating that it acted consistently with normal practice in secured party sales, which is that unsold property becomes part of the landlord's ownership. Furthermore, evidence that was allowed indicates that the parties acted consistently in other respects with secured party sales transactions. For example, Rejas claimed in its complaint only about the failure to remove the kiln and bag house, even though many other items were left at the property. Rejas also listed only the kiln and bag house in response to an interrogatory request for a list of "any and all items" that Rejas claimed NCB was obligated to remove from the premises. At trial, counsel for Rejas argued, while making an objection, that NCB had "cherry-picked" and sold 90% of the collateral, and could not disclaim responsibility for the rest. However, the evidence indicates that this type of conduct, if true, occurred on both sides. After reviewing the entire transcript, one could reasonably infer that Rejas interfered with the bidding for the purpose of retaining property that it could later sell for profit outside the auction. It is also undisputed that Rejas retained control of a substantial amount of property, including bucket elevators, conveyors, freight train cars, and office equipment, while curiously failing to claim that NCB should remove this property as well.
 {¶ 67} Other contract terms are consistent with secured party transactions. For example, the contract between Rejas and NCB stresses that NCB did not assume liability for the lease agreement between Rejas and Counselor, and that the NCB contract was not a continuation of the lease. When the NCB contract was signed in July, 2001, Rejas had an existing lease agreement with Counselor that would have expired on December 31, 2001, or less than six months later. Had NCB and Rejas contemplated a long-term obligation, NCB would not have needed to include a provision disclaiming responsibility for the lease. Moreover, the choice of a monthly rate for two months, followed by a "daily rate" indicates that the parties anticipated a short term obligation. This is consistent with the practice of auctioning equipment and then leaving the rest for the landlord, which was proffered as a secured party sales practice.
 {¶ 68} Ironically, as a secured creditor, NCB had only a right to possession of any secured chattels, and would not have been liable for storage of its security interest in any goods and chattels located on the landlord's property. Scott v. AmeritrustCo. Nat. Ass'n. (May 29, 1986), Cuyahoga App. Nos. 50667 and 50668, 1986 WL 6124, *3. See also, Campanella v. CommerceExchange Bank (C.A.6, 1998) 137 F.3d 885, 893 (interpreting Ohio law, and finding that a secured creditor's right to acquire possession of collateral, or constructive possession of collateral, "simply does not give rise to a duty to pay expenses related to the storage of collateral"). Once a secured creditor takes actual possession of premises, it may be held liable for expenses under a theory of unjust enrichment. See Myers v. FifthThird Bank (1993), 89 Ohio App.3d 344, 347, 624 N.E.2d 748
(holding a secured party liable to the lessor for one month of the debtor's lease obligation, where the secured party entered the leased premises, changed the locks, and took possession of collateral for purposes of inventory and sale).
 {¶ 69} Based on the preceding discussion, we find that the magistrate and trial court erred in finding the contract unambiguous and in refusing to admit parol evidence. Accordingly, the judgment in favor of Rejas will be reversed and this matter will be remanded for further proceedings.
 III {¶ 70} Turning now to the specific assignments of error, we note that in the first assignment of error, NCB focuses on the trial court's alleged error in converting a short-term storage agreement into a long-term lease that provided Rejas with a windfall. In the fourth assignment of error, NCB also contends that the trial court committed reversible error by relying on the transcript and decisions made by the magistrate. Among the matters challenged in the fourth assignment of error is the magistrate's decision to reject parol evidence. As we have indicated, this decision resulted in reversible error.
 {¶ 71} In its brief, Rejas does not directly tie any argument to the listed assignments of error. Instead, Rejas responds to what it calls NCB's "five primary arguments" — the first of which is the alleged ambiguity of the agreement. In this regard, Rejas contends that the agreement with NCB is not ambiguous and that parol evidence was properly excluded. Since we disagree, the first and fourth assignments of error will be sustained.
 {¶ 72} In its brief, Rejas also argues that the issue of "abandonment" of the collateral was an affirmative defense that was waived. In contrast, NCB claims in the fourth assignment of error that abandonment was part of the liquidation process as understood by the parties and was not an affirmative defense. NCB further argues that the matter was raised in the pretrial briefs and was understood to be an issue for trial.
 {¶ 73} We mentioned earlier that NCB did raise abandonment in its pretrial brief. NCB also attempted to present evidence about abandonment of collateral, as an alleged part of the Article 9 secured party sales process. Rejas objected to this evidence without specifying a basis, and the magistrate sustained the objection without giving a reason for the decision.
 {¶ 74} In a later written decision on the merits of the trial, the magistrate found that "abandonment" was an affirmative defense and that it had been waived. The magistrate also concluded that even if NCB had not waived this issue, the contract did not explicitly provide NCB with the right to abandon collateral. And finally, the magistrate rejected a theory of implied abandonment, because the contract was unambiguous. NCB timely objected to these findings. However, when the trial court adopted the magistrate's decision, it did not address NCB's objections.
 {¶ 75} We have already indicated that the contract was ambiguous, and that the magistrate erred in refusing to admit extrinsic evidence of negotiations and customary practices in secured party sales transactions. Notably, the issue of abandonment was first inserted into the negotiations by Rubin, who appeared well versed in secured party transactions. Therefore, even under the evidence that was allowed, it appears that the parties contracted with awareness of a secured party's right to abandon its interest in collateral.
 {¶ 76} We also find the matter was not waived. Generally, abandonment is an affirmative defense. For example, if Rejas had been sued by Counselor for the return of property Counselor left on the leased premises, Rejas could have asserted abandonment as an affirmative defense. See Kuhn v. Kleptz, Montgomery App. No. 20668, 2005-Ohio-4523, at ¶ 7-9. Similarly, a party may abandon its rights under a contract, and in that case, abandonment would be an affirmative defense to enforcement of the contract. See,e.g., Buckeye Telesystem, Inc. v. MedCorp., Inc., Lucas App. No. L-05-1256, 2006-Ohio-3798, at ¶ 31.
 {¶ 77} The claim in the present case, however, was not that either Rejas or NCB abandoned its rights under the contract. Instead, NCB contended that abandonment of collateral is the normal course of events in secured party sales, and that the parties contracted with that in mind. Under the circumstances, abandonment would not be an affirmative defense.
 {¶ 78} In Buckeye Telesystem, the Sixth District Court of Appeals held that the defendant had waived the defense of abandonment because it had failed to raise the matter in its pleadings, or in its trial brief, closing argument, and proposed findings of fact. Id. In contrast, NCB specifically raised the issue of abandonment in its pretrial statement and in its post-trial brief.
 {¶ 79} As a final matter, Rejas contends that even if the agreement permitted abandonment, there was no evidence that NCB abandoned the kiln and bag house. We disagree. As the court noted in United Natl. Bank of Parkersburg, W. Va. v. Norton Mach. Co.
(1991), 81 Ohio App.3d 101, 106, 610 N.E.2d 486, "it is generally understood that a security interest may be `waived.'" Waiver may be explicit or implicit. Id. "To establish implicit waiver of a security interest, `there must exist unequivocal acts or conduct evidencing an intent to waive [since such] will not be inferred from doubtful or ambiguous factors.'" Id. (Emphasis and parenthetical material in original. Citation omitted).
 {¶ 80} NCB suggests that custom and practice in Article 9 secured party sales is that the party with a collateral interest leaves the property to the landlord at the end of the sale, NCB acted consistently by informing Rejas that all the collateral had been removed. Although NCB did not use the express term, "abandonment," in its correspondence, the intent to abandon was unequivocal.
 {¶ 81} Accordingly, the first and fourth assignments of error are sustained, and this matter will be reversed and remanded for further proceedings consistent with this opinion.
 IV {¶ 82} In the second assignment of error, NCB contends that the trial court erred in ruling that the kiln and second bag house were "collateral" under the agreement. NCB alleges that these items were fixtures and were not collateral within the meaning of NCB's prior security agreement with Counselor. In the fifth assignment of error, NCB also points out an alleged inconsistency between two trial court findings: (1) that the kiln and bag house were collateral because they could be easily removed; and (2) that removing the bag house and kiln to mitigate damages was not required because it would be an "extraordinary effort."
 {¶ 83} One difficulty in this case is that both NCB and Rejas acted as if they had an interest in the kiln and bag house, regardless of whether those items were classified as "collateral" or as "fixtures." As we mentioned, the contract stated that the "collateral" was located at the "manufacturing facility" of Rejas, which clearly implies that something other than land and truck scales belonged to Rejas. Rejas asserted further ownership interest, by refusing to let NCB sell a "fixture," i.e., the truck scales, and by interfering with the sale of the bag house the auction.
 {¶ 84} In this regard, we note that while Katz denied cancelling the sale of the bag house, his testimony was both contradictory and illogical. When testifying, Katz first said that he had told the auctioneer (Wilson) that whomever took the bag house should observe EPA regulations. However, Katz later testified that if "someone said" at the auction that anyone buying the bag house would have to remove it in accordance with EPA regulations, and he stated that he didn't hear anything and that it "went over" his head.
 {¶ 85} In contrast, Wilson testified that Katz cancelled the sale of the bag house. After the bag house was sold to bidder #12 for $50, Katz said that he did not want to sell the bag house because it had to be removed in compliance with EPA regulations. Katz was not sure that the individual purchasing the bag house would do this. A reasonable inference from the testimony is that Rejas was concerned about paying for clean-up costs, or at a minimum, about having a dispute over environmental clean-up.
 {¶ 86} Following Katz's comments, Wilson told bidder #12 that the landlord did not want to sell the bag house. Notably, there was simply no evidence that NCB had anything to do with cancelling the sale. NCB did hire Wilson to sell the goods, but there was no evidence that Wilson did anything with regard to the cancellation, other than convey Katz's remarks to the bidder. The auction terms were that sales were final when the gavel went down, and that items were sold "as is — where is," and "with all faults." In the absence of any other explanation for the cancellation, Katz's testimony makes no sense and, therefore, lacks merit. Reasonable inferences from the evidence are that Rejas did not want the bag house to be sold for $50, when it was installed originally at a cost of more than a million dollars, and that Rejas wanted to avoid responsibility for potential environmental clean-up costs.
 {¶ 87} NCB also asserted an interest in the bag house and kiln by attempting to sell them at auction. In view of the ambiguity in the contract and the fact that both parties asserted an interest in kiln and bag house, legally classifying these items either as "collateral" or as "fixtures" is irrelevant. No matter how a court might legally classify these items, it is the intention of the contracting parties that is pertinent.
 {¶ 88} We do agree with NCB that it is inconsistent to find that the kiln and bag house could be "easily removed," while concluding at the same time that removal would be extraordinary for the purposes of mitigating damages. However, we will discuss this point further when we consider the fifth assignment of error.
 {¶ 89} Based on the preceding discussion, the second assignment of error is sustained in part. The trial court did err in classifying the kiln and bag house as collateral, but the error, more importantly, is simply due to the fact that the classification, itself, is irrelevant.
 V {¶ 90} In the third assignment of error, NCB claims that the trial court committed reversible error when it denied NCB's motion to recuse the magistrate. This assignment of error is essentially moot because the case is being reversed and remanded for further proceedings. However, since a possibility exists that the case might again be referred to the same magistrate, we will briefly address recusal.
 {¶ 91} In the middle of the afternoon of the second day of trial, the magistrate recessed trial during presentation of Plaintiff's case, without making a record of her reasons for doing so. Shortly thereafter, NCB filed a motion to recuse the magistrate. The motion was supported by affidavits from four attorneys who represented NCB, as well as the NCB representative who attended the trial. The affidavits of those individuals who were present at the time of recess all basically said the same thing, i.e., that following the recess, the magistrate had said that she had heard enough, that the parties could brief the case now, and that she did not need any more evidence. The magistrate also said, "I am not being objective," and left the bench.
 {¶ 92} In response, Rejas filed affidavits from its attorney and trial representative, who said that NCB's counsel had improperly attempted to argue with the magistrate about legal rulings, and that any comments the magistrate made were clearly in the context of her frustration and irritation with NCB's counsel. These individuals stated that the magistrate did not expressly or impliedly indicate that she had determined the outcome of the case. However, they did agree that the magistrate had said she was not being objective.
 {¶ 93} The magistrate also filed an affidavit, stating that she chose to recess for the day rather than terminating the trial or holding NCB's counsel in contempt for continuing to argue over evidentiary rulings. The magistrate admitted saying that she was not being objective. However, she indicated that this comment referred to her intention, but reluctance, to hold NCB's attorney in contempt, and not to any evidentiary issues in the case. In this regard, the magistrate pointed out that she had been a law school classmate of NCB's attorney and was reluctant to hold him in contempt. Finally, the magistrate said she was ready and willing to preside over the remainder of the trial and to consider all the evidence without regard to the unjustified allegations of bias that had been made.
 {¶ 94} After considering the matter, the trial court overruled the motion for recusal. The court found that the magistrate's comments about ending the trial and lack of objectivity "evidenced a desire to maintain control of the courtroom without being forced into a contempt situation unnecessarily." Several months later, the same magistrate resumed the trial and ultimately issued a decision in favor of Rejas.
 {¶ 95} "[R]emoval of a magistrate is within the discretion of the judge who referred the matter to the magistrate." In reDisqualification of Light (1988), 36 Ohio St.3d 604,522 N.E.2d 458. Therefore, we review the court's decision for abuse of discretion, which means "`more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.'" Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 96} After reviewing the record, we do not find that the trial court's attitude was unreasonable, arbitrary, or unconscionable. From the magistrate's affidavit, it is clear that the remarks in question were made in response to conduct that troubled the magistrate and followed a frustrating experience. However, the magistrate could have used a better choice of words, rather than saying she was not being objective. Because the magistrate was upset with NCB's counsel at the time, her choice of words could, and did, lead to misunderstanding. In the case ofIn re Disqualification of Corrigan, 105 Ohio St.3d 1243,2004-Ohio-7354, 826 N.E.2d 302, Justice Moyer commented that:
 {¶ 97} "[a]s Canon 3(B)(4) of the Ohio Code of Judicial Conduct says, judges should be `patient, dignified, and courteous' when speaking with litigants, lawyers, and others in an official capacity, and Canon 3(B)(5) of the Code admonishes judges to refrain from any words or conduct that might manifest bias or prejudice based on socioeconomic status and other improper factors. Judges are certainly entitled to express dissatisfaction with attorneys' * * * tactics inside and outside the courtroom, but that dissatisfaction can and should be expressed in a way that promotes public confidence in the integrity, dignity, and impartiality of the judiciary."2004-Ohio-7354, at ¶ 10.
 {¶ 98} Although the magistrate's comments might have been better worded, the trial court did not abuse its discretion in denying the motion for recusal. The magistrate expressed willingness to hear the evidence and decide the matter fairly. As the Ohio Supreme Court has stressed, "[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions."In re Disqualification of George, 100 Ohio St.3d 1241,2003-Ohio-5489, 798 N.E.2d 23, at ¶ 5.
 {¶ 99} In light of the preceding discussion, the third assignment of error is overruled.
 VI {¶ 100} In the fifth and final assignment of error, NCB contends that the trial court committed reversible error when it awarded Rejas a windfall in the amount of $434,218.47, plus interest. NCB makes several arguments in support of this point, including the fact that Rejas cancelled the sale of the large bag house, yet claimed that NCB owes $290.32 in perpetuity until it removes the large bag house; that the agreement was short-term and was properly terminated after the auction on October 12, 2001; that there was no meeting of the minds about the purpose of the agreement and its term, leaving the appropriate remedy in equity; that Rejas improperly rejected offers to lease and/or collect storage fees from other parties; that the damages were out of proportion and constituted a windfall; and that the award violated the basic rules of mitigation. In reply, Rejas argues that the measure of damages was set forth in the contract, that the trial court properly concluded that Rejas did not fail to mitigate its damages, and that there was no evidence Rejas acted in bad faith.
 {¶ 101} Since this case is being reversed and remanded for a new trial, we will only briefly discuss this assignment of error. As we previously mentioned, NCB, as possessor of a security interest, had no obligation to Rejas for storage costs, and would only have been held liable under an unjust enrichment theory for a limited amount of storage fees, even if NCB had taken possession of the premises on which the kiln and bag house were located. See, e.g., Myers (1993), 89 Ohio App.3d 344, at 347. We also noted that while the contract is ambiguous, it does appear to anticipate only a short-term obligation. Consistent with this short-term obligation, NCB paid Rejas $27,000, and tendered an additional $3,843 more for the first twelve days of October, 2001. The $27,000 that Rejas did accept exceeded the amount that was realized for the collateral at auction.
 {¶ 102} Despite these facts, the trial court held NCB liable for $434,218.47, plus interest, which represents $290.32 per day, plus prejudgment interest at the legal rate, between October 1, 2001 and May 13, 2005. The magistrate and trial court rejected the concept of mitigation, finding that Rejas had made good faith efforts to earn income from the use of the property. In addition, the court found that Rejas was not required to expend extraordinary sums to remove the kiln and bag house. Notably, the award to Rejas significantly exceeded the original appraised value of all the items of collateral by almost $171,718, and exceeded the estimated amount to remove the bag house and kiln by about $319,218 (assuming maximum removal cost of $75,000).
 {¶ 103} In Frenchtown Square Partnership v. Lemstone, Inc.,99 Ohio St.3d 254, 2003-Ohio-3648, 791 N.E.2d 417, the Ohio Supreme Court noted that:
 {¶ 104} "under the common law of contracts, mitigation is a fundamental tenet of a damage calculus. Contracts are the mutual exchange of promises, with each party holding an expectation of certain obligations and benefits. Thus, contract law acknowledges that mitigation, otherwise known as the doctrine of avoidable consequences, may justly place an injured party `in as good a position had the contract not been breached at the least cost to the defaulting party.'" 2003-Ohio-3648, at ¶ 12.
 {¶ 105} Although lessors have historically been exempt from the duty to mitigate damages, the Ohio Supreme Court decided inFrenchtown to extend the doctrine to commercial leases. Id. at ¶ 17-18. Therefore, the Ohio Supreme Court held that:
 {¶ 106} "[a] lessor has a duty to mitigate damages caused by a lessee's breach of a commercial lease if the lessee abandons the leasehold.
 {¶ 107} "* * * The lessor's efforts to mitigate must be reasonable, and the reasonableness should be determined by the trial court." Id. at paragraphs one and two of the syllabus.
 {¶ 108} In addition to the legally imposed duty to mitigate, the contract between Rejas and NCB stated that Rejas would proportionately reduce the charges to NCB if Rejas received any amount from any other entity for storage of property at the premises. This provision followed two other provisions in the contract. The first provision stated that NCB would give Rejas notice when NCB's collateral was removed. The second provision placed the burden of storage charges on any purchasers who failed to remove their property by the time that NCB gave this notice to Rejas.
 {¶ 109} Mitigation of damages is defined as "the duty of a person to use reasonable efforts under all the circumstances to avoid loss or to lessen his damages." Jenkins v. St. Edward HighSchool (June 18, 1992), Cuyahoga App. No. 60910, 1992 WL 140217, *3. This duty requires "only reasonable, practical care and diligence, not extraordinary measures to avoid excessive damages." Provident Bank v. Barnhart (1992), 3 Ohio App.3d 316,320, 445 N.E.2d 746.
 {¶ 110} The trial court's decision that Rejas acted in good faith and did not fail to mitigate damages is inexplicable in light of testimony from Lawrence Katz. Specifically, Katz testified as follows:
 {¶ 111} "Q. Have you attempted to lease the premises?
 {¶ 112} "A. Not lease it, sell it.
 {¶ 113} "Q. Okay.
 {¶ 114} "A. There have been some offers to lease it, and Iwouldn't — wasn't interested.
 {¶ 115} "Q. Weren't interested in leasing it?
 {¶ 116} "A. No.
 {¶ 117} "Q. What were the offers?
 {¶ 118} "Mr. Hill: Objection.
 {¶ 119} "THE WITNESS: Meaningless. I didn't have anyinterest."
(Emphasis added.)
 {¶ 120} Katz also stated, with regard to an offer from an individual who wanted to store mulch on the property, that he had "turned" his "ears off." This evidence clearly indicates that Rejas made no attempt to mitigate damages.
 {¶ 121} Furthermore, we agree with NCB about the inconsistency in arguing that the kiln and bag house were collateral because they were easily moved, while at the same time claiming that removing them would be an extraordinary measure. By about seven months after the alleged date of breach, the fees and interest, as computed by Rejas, had reached more than $70,000 — or close to the cost of removal (anticipated to be $70,000 to $75,000). However, Rejas made no attempt whatsoever to remove these items and sue for the cost of removal from NCB, which would have been far less than the amount awarded, and would have placed Rejas in the position it would have been in had an alleged breach not occurred. Eaken v. Hirt, 161 Ohio App.3d 620, 622,2005-Ohio-3046, 831 N.E.2d 513, at ¶ 9.
 {¶ 122} Because the trial court erred in calculating damages, the fifth assignment of error has merit and is sustained.
 {¶ 123} Based on the preceding discussion, the first, fourth, and fifth assignments of error are sustained, the second assignment of error is sustained in part, and the third assignment of error is overruled. Accordingly, the judgment of the trial court is reversed, and this matter is remanded for further proceedings.
 . . . . . . . . . . .
Brogan, J., and Wolff, J., concur.
(Hon. Anthony Valen, retired from the Twelfth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
[1] As we mentioned, Rubin wrote to Wiley on June 21, 2001, and stated that the truck scales were permanently attached to the real estate and constituted a "fixture." Therefore, Rejas would not permit NCB to remove the truck scales.