[Cite as *Hahn v. Farmakis-King*, 2026-Ohio-778.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# ASHTABULA COUNTY

LINDA S. HAHN, AS ATTORNEY
IN FACT FOR ROSEMARY G.
FARMAKIS, INCOMPETENT,

      Plaintiff-Appellant,

    - vs -

CHRISTINA FARMAKIS-KING,
AS CO-EXECUTRIX OF ESTATE
OF JAMES FARMAKIS,
DECEASED, et al.,

      Defendants-Appellees.

CASE NO. 2025-A-0009

Civil Appeal from the
Court of Common Pleas

Trial Court No. 2019 CV 00008

---

## OPINION AND JUDGMENT ENTRY

Decided: March 9, 2026
Judgment: Affirmed

---

*Michael P. Geary*, P.O. Box 31, Jefferson, OH 44047 (For Plaintiff-Appellant).

*William P. Bobulsky*, William P. Bobulsky Co., L.P.A., 1612 East Prospect Road, Ashtabula, OH 44004 (For Defendants-Appellees, Christina Farmakis-King and Jamie Zeigler).

*Christopher M. Newcomb*, 213 Washington Street, Conneaut, OH 44030 (For Defendant-Appellee, Nancy Biscotti).

EUGENE A. LUCCI, J.

{¶1} Appellant, Linda S. Hahn, as attorney in fact for Rosemary G. Farmakis, incompetent, ("Hahn"), appeals the judgment which overruled her objections to a magistrate's decision, adopted the magistrate's decision, and dismissed her claims. We affirm.

{¶2}  In a prior appeal, we set forth the history of this case as follows:

James Farmakis ("husband") and Rosemary G. Farmakis ("wife") were married in June 1994. The couple resided in Sharon, Pennsylvania. Before the marriage, they entered into an antenuptial agreement. Pursuant to that agreement, husband and wife acknowledged that wife had at least $200,000 in separate funds and a house, which was separate property, valued at $100,000. Husband also possessed specific separate assets, including real property located in Conneaut, Ashtabula County, Ohio.

On November 1, 1995, husband executed a promissory note through which he promised to pay wife, on demand, the principal sum of $100,000, plus interest from the date at a rate of 10 percent per annum. The money upon which the note was premised came from wife's separate property. The note was negotiated in Pennsylvania, signed in Pennsylvania, and payment was to be made in Pennsylvania. Moreover, the note included a confession of judgment provision.

Husband made no payment of principal or interest under the promissory note from the date of its execution. In August 2009, husband provided a mortgage to secure the note. Husband mortgaged the real property in Conneaut, Ohio, as security for performance of the obligation under the promissory note.

On September 16, 2017, husband transferred all his remaining interest in the real estate subject to the 2009 mortgage to his daughters, Christina Farmakis-King and Jamie Zeigler, as co-trustees of the James Farmakis Family Trust dated January 9, 2017. Husband died on February 12, 2018, in Mercer County, Pennsylvania. At the time of his death, he and wife resided in Hermitage, Pennsylvania. Christina Farmakis-King and Jamie Zeigler were appointed co-executrices of the estate of husband, in Case No. 43-18-0295, before the Orphans' Court Division of the Court of Common Pleas of Mercer County, Pennsylvania.

At the time of husband's death, wife remained the holder, owner, and payee under the 1995 promissory note. No amount, however, had been paid, either in princip[al] or interest. According to the note, a default occurs, which immediately results in acceleration of the full amount upon, inter alia, the death of the maker. Wife maintains, as of March 1, 2021, the accrued interest on the note was $253,332, plus

the $100,000 principal, for a total of $353,332, plus interest at 10 percent per annum from that date.

In addition to the interest wife possessed in the real property relating to the 2009 mortgage, she also has a right to receive $170,100 from the sale of that real estate by reason of a separate agreement entered into on November 14, 2013 by husband, wife, and one Nancy L. Biscotti, acting individually and as the executrix of the estate of Joseph Biscotti, deceased. This agreement was derivative of a March 2007 judgment entry wherein Joseph Biscotti (a former business associate of husband) was to receive 10 percent of the proceeds from the sale of the Conneaut real property, but only after wife received the first $125,000 from the proceeds of the sale. Wife maintains she does not remember why she obtained an interest in the first $125,000 of real estate's sale, but she did not believe it was related to the payoff of the 1995 promissory note.

In January 2019, wife filed the underlying complaint in foreclosure for the amount due on the promissory note against . . . Christina Farmakis-King and Jamie Zeigler, daughters of husband and executrices of his estate (["appellees"]).

*Hahn v. Farmakis-King*, 2024-Ohio-786, ¶ 2-8 (11th Dist.). Wife requested the Conneaut property be sold pursuant to the mortgage, and she sought payment from the sale on the note and on the amount remaining due to her pursuant to the November 2013 agreement.

{¶3} Appellees moved to dismiss the complaint. Wife filed an amended complaint, and, in response, appellees supplemented their motion to dismiss. The trial court denied appellees' motion. Appellees then filed an answer and counterclaims.

{¶4} Subsequently, the parties filed competing motions for summary judgment, which the trial court overruled. Thereafter, wife's daughter, Hahn, was substituted as plaintiff due to wife's incompetence.

{¶5} In 2023, appellees filed a renewed supplemental and amended motion to dismiss, arguing that, under Ohio law as it existed at the time, a husband and wife could not "by any contract with each other, alter their legal relations, except that they may agree

Case No. 2025-A-0009

to an immediate separation and make provisions for the support of either of them and their children during the separation." *See* former R.C. 3103.06 (effective until Mar. 23, 2023).

{¶6} Treating appellees' motion as a motion to reconsider its original judgment on appellees' prior motion to dismiss, the trial court granted the motion, holding that Hahn's claims failed because husband and wife entered into the promissory note during their marriage, rendering the note invalid under former R.C. 3103.06. In addition, the trial court concluded that if the matter were a creditor's claim, it should be pursued in the Orphan's Court of Mercer County, Pennsylvania, where the estate was being administered. Accordingly, the court granted appellees' motion to dismiss. In addition, the trial court dismissed the counterclaims.

{¶7} In the appeal from that judgment, appellant argued in part that "the trial court engaged in a preliminary error when it failed to apply Pennsylvania law as opposed to Ohio law regarding the validity of the underlying note" and that the trial court erred in its "conclusion that the underlying cause of action would be properly brought before the probate court, rather than the general division of the court of common pleas."[1] *Hahn*, 2024-Ohio-786, at ¶ 27, 38 (11th Dist.). This court agreed with wife on these points. *Id.* Accordingly, we reversed the trial court's judgment to the extent that it dismissed wife's claims on these bases, and we remanded the matter for further proceedings.

{¶8} On remand, a trial was held before a magistrate. The evidence presented at trial established that wife loaned husband $100,000 from her separate property in 1995. In exchange, husband executed a promissory note in favor of wife on November 1, 1995.

---

1. Appellees did not appeal the trial court's dismissal of their counterclaims.

Case No. 2025-A-0009

The note provided that husband, on demand, would pay to wife, "the lesser of (i) the principal sum of One Hundred Thousand Dollars ($100,000), or (ii) the aggregate unpaid principal amount of all loans made by [wife] to [husband], together with interest from the date hereof on the unpaid principal balance hereof at a rate per annum of ten percent (10%)." The note provided that, if husband defaulted, the full amount of principal and interest due would be accelerated. One of the terms of default included the death of husband.

{¶9}   On November 15, 1998, husband entered into a written agreement with Joseph Biscotti, who was managing a golf course formerly located on husband's separate property in Conneaut, Ohio. The 1998 agreement was not introduced into evidence at trial, but the following terms may be discerned from other evidence in the record. Pursuant to the 1998 agreement, in the event of sale of the property, Biscotti would receive ten percent of the net proceeds after payment of $125,000 to wife. There is no indication that the 1998 agreement provided any guidance as to why wife was to receive the first $125,000 in the event of sale of the Conneaut property.

{¶10}  In 2005, in *Biscotti v. Farmakis*, Ashtabula C.P. No. 2005 CV 823, Biscotti brought an action for declaratory judgment with respect to the 1998 agreement, requesting the court find that Biscotti owned a ten percent interest in the remainder of the sale proceeds in the Conneaut property. In a judgment entry entered in 2007, the court found that, although the 1998 agreement lacked formalities sufficient to convey legal title, Biscotti owned a ten percent interest in the remainder of the sale proceeds of the Conneaut property after payment of $125,000 to wife from the proceeds. Again, there is

Case No. 2025-A-0009

no indication in the judgment as to why husband and Joseph Biscotti agreed in 1998 that wife would receive the first $125,000 from a sale of the Conneaut property.

{¶11} On August 27, 2009, husband executed a mortgage in favor of wife on the Conneaut property to secure the 1995 promissory note, which is specifically referenced therein.[2]

{¶12} On November 14, 2013, husband, wife, and Nancy Biscotti, individually and as executor of the estate of Joseph Biscotti, entered into an agreement regarding the Conneaut property. Pursuant to that agreement, the property was to be divided and sold as planned unit development lots ("PUD lots"). The 2013 agreement contains several "whereas" clauses. The first clause recognizes that husband and Joseph Biscotti had entered into a written agreement dated November 15, 1998 "describing the nature of their interests in" the Conneaut property. The next clause references the 2007 judgment entry that determined that Biscotti was entitled to a ten percent interest in the remainder of the sale proceeds of the Conneaut property after wife was paid the first $125,000 of the proceeds. The next "whereas" clause recognizes that the 2007 judgment entry served "by operation of law as a judgment lien against the premises, and FARMAKIS [(defined by the agreement as referring collectively to husband and wife)] could not sell or transfer the property without a release by Biscotti of the judgment lien." The following clause states that "FARMAKIS and their contractor/developer have created and obtained regulatory approval for a Planned Unit Development ('PUD')" on the property which would divide the property into 134 individual lots, open space, and common areas. The final "whereas"

---

2. The trial court concluded that a defeasance clause was unintentionally omitted from the mortgage, but the omission did not affect the validity of the mortgage. Neither party challenges this determination.

Case No. 2025-A-0009

clause provides that "FARMAKIS and BISCOTTI have reached an agreement, the terms of which are provided herein, that, among other things, terminates the BISCOTTI judgment lien established by the aforementioned March 14, 2007 Judgment Entry on the premises and creates a new mortgage in favor of NANCY I. BISCOTTI against the PUD property . . . ."

{¶13} Thereafter, the substance of the agreement includes a provision that wife's "priority interest . . . in the sum of $125,000.00 as established by the [November 15, 1998 agreement] and March 14, 2007 Judgment Entry in the remainder of proceeds from sale of the premises, including the PUD property, is hereby extinguished and terminated by virtue of the agreement herein." The agreement provides that each Nancy Biscotti and wife would receive $1,350 at the time of closing of the sale or transfer of each of the 134 sublots on the PUD property and would "execute a partial release of lien created by this agreement involving the sublot being sold." If not all 134 sublots were sold, then Nancy Biscotti and wife would each retain a ten percent interest in the net sale proceeds on the remainder of the PUD property. Additionally, the parties agreed that Nancy Biscotti would execute a full and final release of the Biscotti estate's interest in the property.

{¶14} Further, the November 2013 agreement contains provisions stating that it is "the full and final agreement between the parties" and that it could only be amended or modified by a written instrument executed by the parties. (Boldface omitted.) The parties agreed that "[n]o prior or contemporaneous oral representations have been made by either party to the other."

{¶15} Following the execution of the November 2013 agreement, husband, wife, and Nancy Biscotti, individually and as executor of Joseph Biscotti's estate, signed an agreement on December 6, 2013, which provided:

> We, the undersigned, do further agree that both the mortgage lien of Rosemary Farmakis recorded on August 31, 2009, in Vol. 460, Pg. 595, Ashtabula County records; and the operation of the Judgment Entry of March 14, 2007, entered by the Court of Common Pleas in case no. 2005 CV 823, *Joseph Biscotti, et al.[ v.] James Farmakis, et al.*; are hereby fully released, satisfied and extinguished as to any property specifically designated as common elements or common areas in the plat of "The Shore-Phase I" as found and recorded in Vol. 20, Pg. 40, Ashtabula County Plat Records. Nothing in this document shall impair the foregoing claims as to any other property unless specifically released by separate instrument.

{¶16} Thereafter, wife signed a "partial release of mortgage" for each PUD lot sold. Six of the eight partial releases entered into evidence provided:

> In return for the sum of $1,350.00 in hand received, the undersigned does hereby acknowledge and declare that a certain Mortgage dated August 27, 2009, filed for record on August 31, 2009 . . . given by James Farmakis to secure payment of $100,000.00, is hereby satisfied and discharged as to the premises known as:
>
> a. Sublot No. . . . in The Shores Planned Unit Development Plat as found recorded in . . .; and,
>
> b. Any and all common elements described in The Shores Planned Unit Development, as currently platted in Phase 1, and as may be hereafter amended.
>
> The terms and conditions of said mortgage shall continue to apply to all other lands therein.

The remaining two partial releases included substantially the same language but omitted subparagraph b.

Case No. 2025-A-0009

{¶17} Based upon these documents, a primary issue argued at trial concerned whether wife's $100,000 loan to husband in 1995 was the basis of the 2007 judgment entry's provision that wife would receive the first $125,000 from any sale of the Conneaut property or whether the 2007 judgment, and by extension, the November 2013 agreement, pertained to a separate debt that husband owed wife.

{¶18} With respect to this issue, we note that the parties agreed to admit wife's depositions to be considered as testimony at the trial. In her depositions, wife maintained that she twice loaned husband $100,000. One loan was evidenced by the 1995 promissory note. However, wife could not recall when she again loaned husband $100,000.

{¶19} Relevant to this issue, husband's nephew, Christian Farmakis, testified over Hahn's continuing objections. Christian, an attorney licensed in Pennsylvania, maintained that he had a close relationship with husband and wife but never acted as an attorney for either of them. Christian maintained that husband and wife each spoke with him about the November 2013 agreement, and they called and told Christian that everything was "cleared up with one agreement," wherein husband would pay back wife and satisfy what was due to the Biscottis.

{¶20} Following trial, the magistrate issued a decision finding that the November 2013 agreement modified the rights in the Conneaut property that wife had received as a result of the 2009 mortgage and recommended that judgment be entered in favor of appellees. Hahn filed objections to the magistrate's decision. On February 10, 2025, the

trial court issued an entry overruling Hahn's objections, adopting the magistrate's decision, and dismissing Hahn's claims.[3]

{¶21}  From this judgment, Hahn raises five assigned errors for our review. Initially, we note that, as this appeal is from a judgment overruling objections to a magistrate's decision and adopting the decision, this court generally reviews a trial court's action on a magistrate's decision for an abuse of discretion. *Banks v. Shark Auto Sales LLC*, 2022-Ohio-3489, ¶ 7 (11th Dist.). "An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'"" *Hays v. Young*, 2024-Ohio-3149, ¶ 25 (11th Dist.), quoting *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004). Where Hahn's assigned errors implicate different standards of review, we address such standards within our discussion of the applicable assigned errors.

{¶22}  In her first assigned error, Hahn argues:

> The trial court erred, to the prejudice of the Plaintiff-Appellant, in overruling Plaintiff-Appellant's Objection No. 3 to the Magistrate's Decision filed on December 13, 2024, regarding the allowance into evidence at the trial of the testimony of Christian Farmakis concerning:

---

3. In reaching its decision, the trial court specified that  "[t]he Mercer County, Pennsylvania Court of Common Pleas trial decision of August 27, 2024 was not considered as evidence in these proceedings. All findings and conclusions were independently made based on the relevant admissible evidence and testimony presented in this case." The Mercer County action involved the same parties as the present action and pertained to whether the transfer of  ownership of the Conneaut property to the trust amounted to a breach of the November 2013 agreement and/or was a fraudulent transfer pursuant to the Pennsylvania Uniform Voidable Transactions Act, and whether wife was entitled to payment on a 2014 "Demand Note." The trial court concluded that there was no breach of contract, the transfer was not fraudulent, and wife was not entitled to payment on the 2014 "Demand Note" for lack of consideration. Wife appealed the Mercer County decision, which the Pennsylvania Superior Court affirmed on October 3, 2025. *Farmakis v. Farmakis-King*, 2025 WL 2815359, *6 (Pa. Super. Ct. Oct. 3, 2025). As the Mercer County proceedings were not considered as evidence by the trial court, we likewise do not consider those proceedings in this appeal.

A) the intention of the parties to, and significance to the parties of, the November 14, 2013 Agreement . . .

B) the effects of that November 14, 2013 Agreement on the 1995 promissory note . . ., and the 2009 mortgage . . .; and

C) statements made by James Farmakis or Rosemary Farmakis about that November 14, 2013 Agreement, the 1995 promissory note, or the 2009 mortgage;

in violation of the parol evidence rule.

{¶23} "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish v. Cicchini*, 2000-Ohio-7, ¶ 17, quoting 11 Williston, *Contracts*, 569-570, § 33:4, at 569-570 (4th Ed.1999). "'"The parol evidence rule is a rule of substantive law which, when applicable, defines the limits of a contract."'" *Galmish* at ¶ 17, quoting *Charles A. Burton, Inc. v. Durkee*, 158 Ohio St. 313 (1952), paragraph one of the syllabus.

{¶24} "In considering the applicability of the parol evidence rule to a written instrument, appellate courts have applied a de novo standard of review inasmuch as the question involves the interpretation of contracts." *Bull Run Props., L.L.C. v. Albkos Props., L.L.C.*, 2011-Ohio-5712, ¶ 22 (11th Dist.), citing *Dassel v. Hershberger*, 2010-Ohio-6595, ¶ 19 (4th Dist.); *Rejas Invests. v. Natl. City Bank*, 2006-Ohio-5586, ¶ 61 (2d Dist.); and *Rice v. Rice*, 2002-Ohio-3459, ¶ 38 (7th Dist.).

{¶25} When interpreting contracts, "[g]enerally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enters., Inc.*, 64 Ohio St.3d 635, 638, 1992-Ohio-28, citing *Kelly v.*

*Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus; and *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51 (1989), syllabus. "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin* at 638, citing *Kelly* at 132. "When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Shifrin* at 638, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246 (1978).

{¶26} "The parol evidence rule derives from the corollary principle of 'contract integration,' which provides that a written contract which appears to be complete and unambiguous on its face will be presumed to embody the final and complete expression of the parties' agreement." *Fontbank, Inc. v. CompuServe, Inc.*, 138 Ohio App.3d 801, 808 (10th Dist. 2000). "A contract is fully integrated when both parties to the contract adopt it as a final and complete statement of the terms of their agreement." *Miller v. Lindsay-Green, Inc.*, 2005-Ohio-6366, ¶ 37 (10th Dist.), citing 11 Williston on Contracts, § 33:14, at 612; and Restatement of the Law 2d, Contracts, § 210(1), at 117 (1981). "A contract is partially integrated when the parties to the contract adopt it as a final expression of only one portion of a larger agreement, making the contract incomplete." *Miller* at ¶ 37, citing 11 Williston on Contracts, § 33:20, at 658. "[T]he parol evidence rule applies to 'fully integrated' contracts, but not to 'partially integrated' contracts." *Miller* at ¶ 37, quoting 11 Williston on Contracts, § 33:19, at 656 (4 Ed. 1999).

Case No. 2025-A-0009

{¶27} The effect of a binding partially or fully integrated agreement on prior agreements is set forth in Restatement of the Law 2d, Contracts § 213 (1981), which provides, in relevant part:

> (1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.
>
> (2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

*See also TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 1994-Ohio-524, ¶ 20. Thus, fully integrated agreements supersede all prior agreements on the same subject matter, whereas partially integrated agreements supersede all prior inconsistent terms. *See id.*

{¶28} An issue presented in this case was whether, and the extent to which, the terms of the 1995 loan as set forth in the promissory note were superseded by the November 2013 agreement. In order to make such a determination, the court was required to determine whether the agreements pertained to repayment of the same debt. Extrinsic evidence was not barred by the parol evidence rule for this purpose, which was not to vary, contradict, or supplement the November 2013 agreement with evidence of prior or contemporaneous agreements. Instead, the purpose was to give effect to the November 2013 agreement as a final agreement of the parties. *See Boblitt v. Briggs*, 1997 WL 822674, *2 (2d Dist. Nov. 21, 1997) (Parol evidence rule does not bar evidence of prior agreements "when that evidence is offered to prove the legal operation of the integration doctrine." (Citation omitted.)).

{¶29} Further, with respect to full or partial integration of the parties' agreement, for the reasons that follow, we conclude that the November 2013 agreement was only a partial integration of the agreement between husband and wife, and parole evidence was

Case No. 2025-A-0009

permitted to supply the missing terms of their agreement. As set forth in our recitation of the facts, the November 2013 agreement contains a merger clause, stating that it "constitutes the full and final agreement between the parties." (Boldface omitted.) The agreement states it was made "by and between JAMES FARMAKIS and ROSEMARY FARMAKIS, husband and wife (hereinafter collectively 'FARMAKIS'), and NANCY I. BISCOTTI, in her individual capacity and as Executor of the ESTATE OF JOSEPH BISCOTTI (hereinafter collectively 'BISCOTTI'). . . ." The "whereas" clauses acknowledge that husband and Joseph Biscotti entered into an agreement regarding the property in 1998, and, thereafter, the Biscottis brought an action against the Farmakises, resulting in the 2007 judgment entry. The "whereas" clauses further express the parties' intention that their November 2013 agreement terminate any lien on the property created by the 2007 judgment entry, which caused husband and wife to be unable to sell or transfer the property without a release from Biscotti.

{¶30} Based on the foregoing, the November 2013 agreement expressed an intent to fully integrate all terms of the agreement between the Farmakises and Nancy Biscotti regarding Nancy Biscotti's interest in the property that arose from the 1998 agreement between husband and Joseph Biscotti. However, there is no indication that wife was a party to the 1998 agreement. The 2007 judgment entry construing the 1998 agreement found that the purpose of the agreement was "to compensate [Joseph] Biscotti for his services as an employee of Farmakis, by granting to him a claim to a percentage of the value of the business enterprise," upon the sale of the Conneaut property. Pursuant to that agreement, the 2007 judgment entry provided that "[u]pon sale of the property [Joseph Biscotti] is entitled to receive, after the payment of $125,000 to Rosemary

Farmakis, ten percent of the remaining net proceeds, without any setoff for taxes, upkeep or maintenance." There is no indication in the November 2013 agreement, nor in the documents therein referenced—the 1998 agreement and the 2007 judgment entry—as to the agreement between husband and wife underlying wife's $125,000 interest in the sale of husband's property. Accordingly, although the November 2013 agreement is fully integrated between the Farmakises and Nancy Biscotti, it is only a partial integration of an underlying agreement between husband and wife individually. Therefore, parol evidence was properly admitted to determine the terms of the agreement between husband and wife and to ascertain the extent to which the terms of prior agreements were superseded by the terms of the November 2013 agreement.

{¶31} Therefore, the trial court did not err in considering parol evidence, and the first assigned error lacks merit.

{¶32} In her second assigned error, Hahn contends:

> The trial court erred, to the prejudice of the Plaintiff-Appellant, in overruling Plaintiff-Appellant's Objection No. 4 to the Magistrate's Decision filed on December 13, 2024, regarding the allowance into evidence at the trial, and the refusal to strike from the record, the entire testimony of Christian Farmakis regarding communications between Rosemary Farmakis and Christian Farmakis, that was against the interests of Rosemary Farmakis, with whom Christian had an attorney-client relationship, and in violation of the attorney-client privilege under R.C. 2317.02(A), without Rosemary's waiver of her rights.

{¶33} R.C. 2317.02(A)(1) provides that an attorney shall not testify "concerning a communication made to the attorney by a client in that relation or concerning the attorney's advice to a client, except that the attorney may testify by express consent of the client or, if the client is deceased, by the express consent of the surviving spouse or

the executor or administrator of the estate of the deceased client." A "client" for purposes of R.C. 2317.02(A):

> means a person, firm, partnership, corporation, or other association that, directly or through any representative, consults an attorney for the purpose of retaining the attorney or securing legal service or advice from the attorney in the attorney's professional capacity, or consults an attorney employee for legal service or advice, and who communicates, either directly or through an agent, employee, or other representative, with such attorney; and includes an incompetent person whose guardian so consults the attorney in behalf of the incompetent person.

R.C. 2317.021(A).

{¶34} Hahn maintains that the court erred in allowing Christian to testify because she contends that an attorney-client relationship existed between wife and Christian, citing *Cuyahoga County Bar Assoc. v. Hardiman*, 2003-Ohio-5596, for the proposition that a formal contract and retainer are not necessary to form an attorney-client relationship. In support, Hahn indicates that Christian's testimony affirmed that he advised wife as to her legal rights.

{¶35} However, Christian testified that he spoke with the Farmakises regarding the documents at issue in this case, but that he did so in his capacity of their nephew. Christian maintained that he did not prepare, and was not involved in the preparation of, any of the documents at issue in this case. Although Christian testified that wife trusted his advice, he did not testify as to any legal advice provided to the wife or husband or to any instances when they sought legal advice from him.

{¶36} Accordingly, Hahn failed to establish that wife or husband spoke with Christian for the purpose of retaining him or securing legal service or advice from him in

Case No. 2025-A-0009

his professional capacity. Consequently, the trial court did not err in overruling Hahn's objection to the magistrate's decision on this issue.

{¶37} Therefore, Hahn's second assigned error lacks merit.

{¶38} We next address together Hahn's third and fifth assigned errors, in which she maintains:

> [3.] The trial court erred, to the prejudice of the Plaintiff-Appellant, in making the following findings and conclusions, in overruling the Plaintiff-Appellant's Objections Nos. 5, 6, 11, 12, and 13 to the Magistrate's Decision filed on December 13, 2024, concerning the following Magistrate's findings and conclusions, and in approving and adopting the Magistrate's decision that included the following findings and conclusions:
>
> A) The November 14, 2013 Agreement was intended to replace, and did replace, the 2009 mortgage and was intended to settle, and did settle, the preexisting debts that James Farmakis owed to Rosemary Farmakis and all preexisting agreements concerning such debts. . . .
>
> B) The parties intended to combine all obligations, including the 1995 promissory note and 2009 mortgage, relative to the subject real estate within the "four walls" of the 2013 Agreement. . . .
>
> C) The 2013 Agreement extinguishes the valid 2009 mortgage, modifies the rights that Rosemary Farmakis obtained in the real property by reason of the 2009 mortgage, and substitutes a per lot payment as each PUD lot is sold. . . .
>
> D) The 1995 promissory note and 2009 mortgage "were canceled and successively superseded by the 2007 Judgment Entry (Exhibit #8), the 2013 Agreement (Exhibit #7 and #7B) and evidenced by the partial releases of mortgages (Exhibit #7A)." . . .
>
> E) Rosemary Farmakis "agreed to sign partial releases of the mortgage for each PUD lot sold." . . .
>
> F) Exhibits 7, 7A, and 7B "expressly link the 2009 mortgage to the 2013 agreement." . . .

[5.] The trial court erred, to the prejudice of the Plaintiff-Appellant, in overruling the Plaintiff-Appellant's Objections nos. 6(D), 6(E), and 6(F) to the Magistrate Decision filed on December 13, 2024, in approving and adopting that Magistrate's Decision, in concluding the Plaintiff-Appellant failed to prove her claims, and in awarding judgment in favor of the Defendants-Appellees, Christina Farmakis-King and Jamie Zeigler, and against the Plaintiff-Appellant, on the Plaintiff-Appellant's First Cause of Action in the First Amended Complaint for a monetary judgment on the 1995 promissory note, and on the Plaintiff-Appellant's Second Cause of Action in the First Amended Complaint for a foreclosure of the 2009 mortgage, all of which actions by the trial court were against the manifest weight of the evidence.

{¶39} In her third assigned error, Hahn challenges particular findings of the magistrate adopted by the trial court, and, in her fifth assigned error, Hahn challenges the trial court's determination that she failed to prove her claims. Both assigned errors implicate a review under the manifest weight of the evidence. *Butera v. Beesler*, 2023-Ohio-2257, ¶ 19 (11th Dist.); *see also Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12 ("whether a contract is ambiguous is a question of law, but the resolution of an ambiguous term in a contract is a question of fact").

{¶40} "A challenge to the manifest weight of the evidence requires an appellate court to review the evidence presented 'including the reasonable inferences and the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the decision must be reversed.'" *Straight v. Straight*, 2020-Ohio-4692, ¶ 24 (11th Dist.), quoting *Chandler v. Chandler*, 2017-Ohio-710, ¶ 13 (11th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "The weight to be given evidence and witness credibility are primarily for the trier of fact."

Case No. 2025-A-0009

(Citation omitted.) *Straight* at ¶ 25. "The trier of fact is free to believe all, part, or none of a witness'[ ] testimony." (Citation omitted.) *Id.*

{¶41} Here, in the February 10, 2025 judgment, the trial court adopted the magistrate's findings, specifically including, as relevant here:

> Pursuant to the 2013 Agreement the Conneaut Shores Golf Course property would be divided and sold as planned unit development lots (PUD lots), and Rosemary Farmakis would receive $1,350 for each PUD lot sold.
>
> Rosemary Farmakis agreed to sign partial releases of the mortgage for each PUD lot sold.
>
> Total payment of all lots sold will exceed the principal of the 1995 Promissory Note.
>
> The Agreement of 2013 modified the rights that Rosemary Farmakis obtained in the real estate of the 2009 mortgage.
>
> . . .
>
> The 2013 Agreement was intended to replace the 2009 mortgage and settle the preexisting debts that James Farmakis owed to Rosemary Farmakis.
>
> Plaintiff's Trial Exhibits #7, #7A, #7B expressly link the 2009 mortgage to the 2013 agreement. . . .
>
> . . .
>
> The intentions of the parties were to combine all obligations, including the 1995 promissory note, and 2009 mortgage, relative to the subject real estate, within the "four walls" of the 2013 Agreement.
>
> The 2013 agreement extinguishes the valid 2009 mortgage and Rosemary Farmakis' priority interest in the property from prior agreements and substitutes a per lot payment with the filing of partial releases of mortgage as each PUD lot is sold.
>
> . . .

The 2013 Agreement settled all preexisting debts that James Farmakis owed to Rosemary Farmakis, and replaced all preexisting agreements concerning such debts. The 2013 Agreement replaced the mortgage which forms the basis of Plaintiff's foreclosure claim.

{¶42} In concluding that wife was not entitled to judgment on her foreclosure claim, the court stated, "the 2013 Agreement terminates the obligations of James Farmakis to Rosemary Farmakis under the 1995 promissory note and the 2009 mortgage."

{¶43} With respect to the third assigned error, Hahn maintains that the trial court erred in adopting the following findings: (1) the November 2013 agreement replaced the 2009 mortgage and settled the debts husband owed to wife; (2) the parties intended to combine all obligations, including the 1995 promissory note and 2009 mortgage in the 2013 agreement; (3) the 2013 agreement extinguishes or modifies the valid 2009 mortgage and substitutes a per lot payment as each PUD lot is sold; (4) the 1995 promissory note and 2009 mortgage were canceled and successively superseded by the 2007 judgment entry and evidenced by the partial releases of mortgage; (5) wife agreed to sign partial releases of the mortgage for each PUD lot sold; and (6) the 2013 agreement expressly relates to the 2009 mortgage.

{¶44} In support of her third assigned error, Hahn maintains that the trial court's findings were supported only by Christian's testimony, and the documents themselves weigh against a determination that the 2013 agreement pertained to the 1995 promissory note or the 2009 mortgage. In her fifth assigned error, Hahn maintains that the judgment is against the weight of the evidence.

Case No. 2025-A-0009

{¶45} As set forth in our discussion of the first and second assigned errors, parol evidence was required to determine whether the November 2013 agreement pertained to the same debt as the 1995 promissory note, and the trial court did not err in considering Christian's testimony on this issue. Christian maintained that husband had indicated that the November 2013 agreement was intended to pay wife and Biscotti amounts that were due to them.

{¶46} Hahn maintains that the "December 6, 2013 agreement, signed by all parties to the November 14, 2013 agreement, clearly acknowledged that Rosemary Farmakis had two separate obligations owed to her: the 2009 mortgage securing the 1995 promissory note and the amount owed to her under the March 14, 2007 judgment." We disagree.

{¶47} First, it is helpful to clarify that the mortgage itself is not an obligation. Instead, the note is evidence of a debt, and the mortgage secured payment of the debt. *See Waker v. Lawson*, 2021-Ohio-1218, ¶ 12-19 (2d Dist.). A mortgage is a type of lien upon real property. "A lien on real property for payment of a debt is a right to have the debt satisfied out of the land, if not otherwise paid. However, as the Ohio Supreme Court has stated, 'there can be no lien unless there is a debt[.]'" *Settlers Walk Home Owners Assn. v. Phoenix Settlers Walk, Inc.*, 2015-Ohio-4821, ¶ 18 (12th Dist.), quoting *Choteau, Merle & Sandford v. Thompson & Campbell*, 2 Ohio St. 114, 124 (1853). "In other words, although there are many types and classes of liens, 'all have this characteristic of being secondary to an existing obligation, usually a debt. If there is no debt the lien ceases to have life or existence for its function has vanished[.]'" *Settlers Walk Home Owners Assn.*

at ¶ 18, quoting *Hughes Plumbing and Heating, Inc. v. Rhoad*, 1979 WL 207953, *2 (3d Dist. May 22, 1979).

{¶48} Thus, although Hahn maintains that the mention of both the 2009 mortgage and the 2007 judgment entry in the December 2013 agreement indicates two separate "obligations," the documents are consistent with the following evolution of a single debt owed from husband to wife, which the parties secured in two different manners.

{¶49} As addressed above, the 1995 promissory note was not originally secured. By the time of the 1998 agreement between husband and Biscotti, husband and wife had apparently reached an agreement whereby wife would receive the first $125,000 of net proceeds from the sale of husband's separate Conneaut property. This could reasonably have been intended to secure payment of the 1995 promissory note, as, aside from wife's recollection that she at some point loaned husband an additional $100,000, there is no evidence in the record that wife's interest in the property arose from an obligation different than the loan evidenced by the promissory note.

{¶50} Further, a $125,000 lien on the property would nearly have equaled the $130,000 that would have then been due on the note in the case of default (the principal of $100,000 plus approximately three years interest at the annual rate of 10 percent). The 2007 judgment entry confirmed wife's $125,000 interest in a sale of the Conneaut property pursuant to the 1998 agreement, again without reference as to the source of her interest. However, the 2007 judgment entry construed the 1998 agreement between husband and Joseph Biscotti, and it is unsurprising that wife's interest is only mentioned with respect to her superior interest to Biscotti in the sale proceeds without discussion of the agreement between husband and wife that resulted in her interest. The 2009

mortgage expressly secured payment on the 1995 promissory note with the Conneaut property. The November 2013 agreement extinguished the parties' rights under the 2007 judgment entry. The November 2013 agreement does not expressly reference the 2009 mortgage. However, the November 2013 agreement extinguished the 2007 judgment entry, which, again, construed the 1998 agreement between husband and Joseph Biscotti, not an agreement between husband and wife. For the reasons set forth in our discussion of Hahn's first assigned error, the November 2013 agreement constitutes only a partial integration of the terms of an underlying agreement between husband and wife, as nowhere within these documents does there exist any indication as to what husband received in exchange for granting wife a $125,000 interest in the sale of the property.

{¶51} The dissent questions why, if wife's $125,000 priority interest was intended to secure the debt evidenced by the 1995 promissory note, husband would execute a separate mortgage in 2009 relative to the same debt. We find no inconsistency in this conduct. The 2009 mortgage was executed two years *after* the 2007 judgment entry that confirmed wife's priority interest—but the 2007 judgment entry arose from litigation initiated by *Biscotti*, not wife, and construed an agreement between *husband and Biscotti*. Wife's $125,000 interest was referenced only incidentally in that proceeding. A prudent creditor in wife's position might well have desired a mortgage instrument that expressly secured her interest in her husband's property, particularly given that her priority interest had been recorded by way of a judgment resulting from litigation to which she was not a primary party.

{¶52} Further, wife's priority interest in a sale of the property as referenced by the 2007 judgment entry was limited to $125,000. The 2009 mortgage allowed for wife to

Case No. 2025-A-0009

foreclose in the event of default and collect from the sale the full amount of the principal and accumulated interest due, while maintaining her priority interest in the first $125,000 from the sale. The execution of a mortgage to provide additional, direct security for an existing debt is a common and logical practice—not evidence that two separate debts existed. *See* 69 Ohio Jur.3d, Mortgages and Deeds of Trust, § 2 (a mortgage is merely security for a debt and may be executed at any time to secure an existing obligation).

{¶53} In concluding that the November 2013 agreement was intended to pertain to all of husband's debts owing to wife, the trial court placed significant weight on the parties' course of conduct following the November 2013 agreement. In the December 2013 agreement, the parties agreed that the 2009 mortgage and the 2007 judgment entry were "fully released, satisfied and extinguished as to any property specifically designated as common elements or common areas in the plat of 'The Shore-Phase I' as found and recorded in Vol. 20, Pg. 40, Ashtabula County Plat Records." Thereafter, wife released the 2009 mortgage as to each sublot sold and received $1,350 per sublot in accordance with the November 2013 agreement.

{¶54} This course of conduct indicates that the debt underlying both the mortgage and the November 2013 agreement was the same, and that the parties intended to revise their prior agreements as to husband's repayment of the debt to wife which had been set forth in the 1995 promissory note. We cannot say that the trial court's judgment was against the weight of the evidence insofar as it determined that the terms of the November 2013 agreement superseded the terms of the promissory note. There is no evidence of default on the revised terms of repayment, and therefore there is no basis for foreclosure

on the 2009 mortgage. On this basis, we affirm the trial court's judgment in favor of appellees on wife's claims.

{¶55} However, in reaching this conclusion, we note that the weight of the evidence does not support the trial court's finding that the 1995 promissory note or the 2009 mortgage was "extinguished" or "terminated" by virtue of the November 2013 agreement.[4] In making these findings, it appears that the trial court determined that the November 2013 agreement *fully/completely* integrated the agreement of husband and wife relative to the 1995 loan, resulting in termination of all prior agreements pertaining to the same subject. *See* Restatement of the Law 2d, Contracts, § 213 (1981) ("A binding completely integrated agreement *discharges prior agreements* to the extent that they are within its scope." (Emphasis added.)). However, as previously addressed in our discussion of Hahn's first assigned error, we have determined that the November 2013 agreement constituted a partial integration of the agreement between husband and wife regarding the 1995 loan. Therefore, the prior agreements of husband and wife relative to the 1995 loan were replaced only insofar as they were inconsistent with the terms of the November 2013 agreement. *See* Restatement of the Law, Contracts, § 213 (1981) ("A binding integrated agreement discharges prior agreements *to the extent that it is inconsistent with them*." (Emphasis added.)).

{¶56} The terms of repayment in the November 2013 agreement therefore superseded the terms of the promissory note. However, the December 2013 agreement and the partial releases of the 2009 mortgage provide that wife's 2009 mortgage interest continued as to the land not expressly released. Accordingly, the parties' conduct

---

4. "Extinguish" means "[t]o terminate or cancel." *Black's Law Dictionary* (12th ed. 2024).

Case No. 2025-A-0009

following execution of the November 2013 agreement indicates their intention that the 2009 mortgage survive the November 2013 agreement, with wife releasing her interest in the property associated with a sold lot when she received her payment for that lot. As the 2009 mortgage is tied to the 1995 promissory note, it follows that the parties intended the 1995 promissory note to also remain in place, as revised by the terms set forth in the November 2013 agreement.

{¶57} The dissent observes that no satisfaction of mortgage was filed and the promissory note was never returned to husband, suggesting this undermines the conclusion that the November 2013 agreement affected the parties' prior arrangements. We disagree.

{¶58} The November 2013 agreement did not provide for immediate satisfaction of wife's interest; rather, it restructured the terms of repayment by providing that wife would receive $1,350 upon the sale of each of the 134 PUD lots. Full payment under the November 2013 agreement totals $180,900 (134 lots × $1,350 per lot)—an amount that will not be realized until all lots are sold. The parties' chosen mechanism for documenting this incremental repayment was the partial release of mortgage, executed as each lot is sold. Until all lots are sold and wife receives full payment, there is no occasion to file a complete satisfaction of the mortgage or to return the promissory note. The absence of a full satisfaction is thus entirely consistent with—indeed, it confirms—the parties' intention that the 2009 mortgage remain in place as security for the restructured repayment obligation until that obligation is fully discharged. The dissent's argument proves too much: if the absence of a filed satisfaction meant the November 2013 agreement had no effect on the mortgage, the partial releases would be inexplicable, as wife would have

had no reason to release any portion of the mortgage in exchange for the $1,350 payments.

{¶59} Despite our conclusion that the trial court erred to the extent it determined the November 2013 agreement completely integrated the agreements of husband and wife as to the payment of husband's debts to wife and extinguished the 1995 promissory note and the 2009 mortgage, "a reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as a basis thereof." (Citations omitted.) *State ex rel. Carter v. Schotten*, 1994-Ohio-37, ¶ 12; *see also State ex rel. McGrath v. Ohio Adult Parole Auth.*, 2003-Ohio-5062, ¶ 8. As we determined above that the terms of loan repayment, as revised by the November 2013 agreement, were not in default, the trial court's errors with respect to these findings do not provide a basis for reversal. *See CitiMortgage, Inc. v. Taylor*, 2016-Ohio-8337, ¶ 18 (10th Dist.) (default is one of the essential elements a plaintiff must prove in a foreclosure action).

{¶60} Further, although we agree with the dissenting opinion that the trial court erred in concluding that the mortgage was extinguished, we disagree with the dissenting opinion's application of the rule of expressio unius est exclusio alterius. As with any other canon of construction, this rule is an aid to identifying the parties' intentions where a contract term is ambiguous. "'[I]t has force only when the items expressed are members of an "associated group or series," justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.'" *New Albany Park Condominium Assn. v. Lifestyle Communities, Ltd.,* 2011-Ohio-2806, ¶ 23 (10th Dist.), quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), citing *United States v. Vonn*, 535 U.S. 55, 65 (2002); *Summerville v. Forest Park*, 2010-Ohio-6280, ¶ 35. In the present case, the

Case No. 2025-A-0009

2007 judgment lien and the 2009 mortgage are not of the same character—the 2007 judgment lien resulted from litigation initiated by Nancy Biscotti relative to an agreement between husband and Joseph Biscotti, while the mortgage was a private transaction between husband and wife. Mentioning the judgment lien in the November 2013 agreement, which mainly resolved the Biscotti interest, does not lead to a conclusion that husband and wife intended the November 2013 agreement to have no effect on their own prior agreements.

{¶61} Moreover, we note that the canon of expressio unius est exclusio alterius is an aid to interpreting ambiguous terms *within* a contract—it does not operate to exclude other evidence of intent such as their subsequent course of conduct. Here, as set forth above, the November 2013 agreement expressly addressed the 2007 judgment lien because that lien arose from the Biscotti litigation and was the primary obstacle to the planned unit development. The agreement's silence regarding the 2009 mortgage does not establish that husband and wife intended the mortgage to be wholly unaffected by their new arrangement. To the contrary, the conduct between husband and wife immediately following execution of the November 2013 agreement—specifically, the December 6, 2013 agreement and the subsequent partial releases of mortgage in exchange for the $1,350 per-lot payments contemplated by the November 2013 agreement—demonstrates that husband and wife understood the mortgage to be linked to, and governed by, the terms of the November 2013 agreement. The canon of expressio unius is not nearly as compelling as the parties' demonstrated course of dealing. *See* Restatement of the Law 2d, Contracts, § 202(4) (1981) ("[W]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the

Case No. 2025-A-0009

performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

{¶62} As the ultimate judgment in favor of appellees on wife's claims is supported by the manifest weight of the evidence, wife's third and fifth assigned errors lack merit.

{¶63} In her fourth assigned error, wife argues:

> The trial court erred as a matter of law, to the prejudice of the Plaintiff-Appellant, in finding and concluding, and in overruling the Plaintiff-Appellant's Objection no. 17 to the Magistrate's Decision regarding an additional finding and conclusion of the Magistrate filed on January 2, 2025, that the Court of Common Pleas of Ashtabula County, Ohio, "does not have jurisdiction to enter a monetary judgment" on the 1995 promissory note in this case. . . .

{¶64} As set forth above, we have determined that the trial court did not err in dismissing Hahn's claims against appellees because the November 2013 agreement revised the terms of repayment on the 1995 loan. In her fourth assigned error, Hahn challenges the trial court's decision to overrule her objections to the magistrate's supplemental findings and conclusions that addressed appellees' remaining defenses to her claims. Thus, our resolution of Hahn's first, second, third, and fifth assigned errors renders her fourth assigned error moot, and we decline to address it.

{¶65} The judgment is affirmed.


ROBERT J. PATTON, J., concurs,

SCOTT LYNCH, J., dissents with a Dissenting Opinion.

_____

Case No. 2025-A-0009

SCOTT LYNCH, J., dissents with a Dissenting Opinion.

{¶66} "[U]nder well-established Ohio law, contracts that are fairly made and freely entered into are valid and enforceable." *Huntington Natl. Bank v. Schneider*, 2025-Ohio-2920, ¶ 16. "The freedom to contract is a deep-seated right that is given deference by the courts," and "[i]t has long been recognized that persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced." (Citation omitted.) *Id.* In fact, "[t]he freedom to contract and the attendant benefits and responsibilities of the parties to a contract" have been deemed so "integral to the liberty of the citizenry" that both the United States and Ohio Constitutions contain provisions safeguarding them from state interference. *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 9. Therefore, "unless there is fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreements." (Citations omitted.) *Schneider* at ¶ 16.

{¶67} At common law, the freedom and integrity of written agreements is protected by the principle that "a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing." (Citation omitted.) *Bellman v. Am. Internatl. Group*, 2007-Ohio-2071, ¶ 7. Commonly, but misleadingly[5], known as the parol evidence rule, this principle expresses the assumption at law "that the formal

---

5. "Despite its name, the parol evidence rule is not a rule of evidence, nor is it a rule of interpretation or construction." *Galmish v. Cicchini*, 2000-Ohio-7, ¶ 17. "It does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), becomes the contract of the parties. The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement. ***Extrinsic evidence is excluded because it cannot serve to prove what the agreement was***, this being determined as a matter of law to be the writing itself." (Citation omitted.) (Emphasis added.) *Id.* at ¶ 18.

Case No. 2025-A-0009

writing reflects the parties' minds at a point of maximum resolution and, hence, the duties and restrictions that do not appear in the written document … were not intended by the parties to survive."  (Citation omitted.)  *Id.*

{¶68}  In the present case, the fairly and freely made agreements between James and Rosemary Farmakis for the repayment of a $100,000 loan were nullified by the lower court for reasons not reflected in the parties' agreements.  The matter was tried before a magistrate who relied on parol testimony to conclude that the $100,000 loan was essentially satisfied or nullified by a subsequent agreement: "The Court is not going to consider any parol evidence.  I think this line of questioning … goes towards the Defendant trying to show that … the mortgage, the note, have been satisfied, and so I'll allow the questioning to continue."  These comments clearly misconstrue both what parol evidence is and why it is, not simply inadmissible, but incompetent to alter the parties' written agreements.  If the agreements themselves do not reflect the intent to satisfy the mortgage or the note, extraneous evidence cannot be considered for that purpose. *Williams v. Spitzer Autoworld Canton, L.L.C.*, 2009-Ohio-3554, ¶ 15 ("admission of evidence violating the parol evidence rule is legally incompetent and should not be considered even if no objection is made at trial") (citation omitted); *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989) ("[i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence").

{¶69}  The majority opinion finds the lower court's judgment to be unsupported by the evidence but nevertheless affirms that judgment, relying, without cause, on the same incompetent parol testimony as the magistrate.  Both the lower court and the majority opinion conflate the $100,000 loan with an independent obligation between James,

Case No. 2025-A-0009

Rosemary, and Joseph Biscotti whereby Rosemary obtained a $125,000 priority interest in the same property as expressed in the November 14, 2013 Agreement. Both the lower court and the majority rely on parol evidence to connect the separate obligations and ignore the integration clause in the November Agreement. The parol evidence, moreover, is inconsistent with all the documentary evidence in this case, supporting neither the trial court's conclusion that the Agreement satisfied the $100,000 debt nor the majority opinion's conclusion that the Agreement modified the terms of repayment. It is the duty of this court (and all courts in Ohio) to vindicate the parties' fundamental right to contract by enforcing the agreements they have voluntarily made. That means not injecting contractual and economic uncertainty into virtually every written agreement. In particular where, as here, the contracting parties have died or become incompetent, a court should refrain from disrupting matters as arranged and integrated by the parties themselves on the testimony of a third party who did not directly participate in the transactions under consideration. Inasmuch as the present decision deviates from that duty, I respectfully dissent.

### *A Tale of Two Obligations*

{¶70} In 1995, James executed a promissory note in Rosemary's favor. In return for the receipt of $100,000, James promised to repay the same upon demand with interest at a rate of ten percent *per annum*. According to its terms, the note would be in default upon James' death. In 2009, James executed a mortgage in Rosemary's favor securing the debt established by the promissory note. According to the terms of the mortgage: "I, JAMES FARMAKIS, … in consideration of ONE HUNDRED THOUSAND DOLLARS ($100,000) in hand paid by ROSEMARY G. FARMAKIS, … do hereby *Grant, Bargain,*

*Sell and Convey* to the said ROSEMARY G. FARMAKIS, her heirs and assigns forever, the following described *real estate* [the Conneaut Shores Golf Course], situated in the City of Conneaut, County of Ashtabula, and State of Ohio … *Provided Nevertheless*, That the said JAMES FARMAKIS has executed and delivered to the said ROSEMARY G. FARMAKIS, her certain *Promissory Note* dated November 1, 1995 herewith with interest at the rate of ten percent (10%) per annum commencing November 1, 1995 according to terms therein, then these presents shall be void." Subsequent to James' death in 2018, Rosemary made demand for repayment from James' estate. No amount of the loan has been repaid. Rosemary seeks and is entitled to foreclose the mortgage in repayment of the note.

{¶71} The property encumbered by the 2009 mortgage was the subject of another series of agreements between James and Joseph Biscotti dating back to 1998 and the subject of litigation initiated by Biscotti in 2005. Biscotti claimed an interest in the property by virtue of his employment as a manager of the golf course. As determined by the subsequent litigation, James owned ninety percent of the golf course properties and Biscotti owned ten percent: "[I]n the event the properties are sold, [James] will receive ninety percent and Biscotti will receive ten percent of the net proceeds, subject to a subsequent provision of the agreement granting Rosemary Farmakis, the wife of James Farmakis, the first $125,000.00 from the selling price, after which the balance would be divided between [James] and Biscotti in the percentages noted." The terms of this 1998 agreement were confirmed in a 2007 judgment entry resolving Biscotti's claims. This entry makes no mention of the 1995 promissory note. The reasons for Rosemary receiving the first $125,000 of the selling price were and remain unexplained.

{¶72} The 2007 judgment lien was expressly superseded by the November 14, 2013 Agreement. Specifically, the Agreement asserts that it "terminates the BISCOTTI judgment lien established by the … March 14, 2007 Judgment Entry on the premises and creates a new mortgage in favor of NANCY I. BISCOTTI against the PUD [Conneaut] property." Likewise, the "priority interest of ROSEMARY FARMAKIS in the sum of $125,000.00 as established by the Agreement and March 14, 2007 Judgment Entry in the remainder of the proceeds from the sale of the premises, including the PUD property, is hereby extinguished and terminated by virtue of the agreement herein."

{¶73} Nothing, however, on the face of these documents connects the 1995 promissory note and 2009 mortgage with the 2007 judgment entry and November 14, 2013 Agreement. Yet the conclusion of both the trial court and the majority opinion is that Rosemary's priority interest in the proceeds of the sale of the Conneaut property was intended to satisfy the $100,000 loan. To reach this conclusion, the trial court and majority opinion effectively rewrite the agreements executed by the parties contrary to the parties' intent as expressed by the documents and substantive evidence, i.e., the "parol evidence" rule.

{¶74} The premise is illogical: if Rosemary's priority interest in the proceeds from the sale of the Conneaut property was meant to satisfy the note according to the 1998 agreement and 2007 judgment entry, why would James execute a separate mortgage two years later securing the same debt? The most likely reason is also the most obvious, the note and the priority interest are not the same debt.

{¶75} In any event, we do not have to speculate as the majority does in order to fill in perceived gaps in the agreements: the mortgage expressly guarantees the note, the

Case No. 2025-A-0009

1998 agreement and 2007 entry do not. As a matter of law, then, the parties intended the mortgage to guarantee the note but did not intend the 1998 agreement on which the 2007 entry is based to do so. *Aultman Hosp. Assn.*, 46 Ohio St.3d at 53 ("[i]ntentions not expressed in the writing are deemed to have no existence").

***The Parol Evidence Rule***

{¶76} "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish*, 2000-Ohio-7, at ¶ 17, quoting 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4. "The parol evidence rule is a rule of **substantive law** which, when applicable, defines the limits of a contract." (Emphasis added.) *Id.*, quoting *Charles A. Burton, Inc. v. Durkee*, 158 Ohio St. 313 (1952), paragraph one of the syllabus.

{¶77} "If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity." *Shifrin v. Forest City Ents., Inc.*, 1992-Ohio-28, ¶ 11. Stated otherwise, parol evidence cannot be used "to *create* ambiguity in the contract" so as to justify its own admission. *Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, 2022-Ohio-4379, ¶ 20.

{¶78} The November 14, 2013 Agreement is an integrated agreement by virtue of the following integration clause: "**This document shall be recorded with the Ashtabula County Recorder, and constitutes the full and final agreement between the parties.** … The agreement herein can only be amended or modified by a written instrument executed by the parties hereto. No prior or contemporaneous oral representations have

Case No. 2025-A-0009

been made by either party to the other. Any amendment of, supplement to, or modification of the terms of this Agreement must be in writing, executed by the parties."

{¶79} The majority opinion concludes that the foregoing is merely a partial integration clause. The idea is that "[a] contract is partially integrated if the parties adopt it as a final expression of only one portion of a larger agreement, making the contract incomplete." (Citation omitted.) *McOmber v. Liebrecht*, 2023-Ohio-2019, ¶ 31 (3d Dist.). In this respect, "[p]arol (extrinsic) evidence is admissible to clear up ambiguities with respect to the terms that are not integrated." (Citation omitted.) *Id.* The November 14, 2013 Agreement is not incomplete and is not part of some larger agreement. By its own terms, it is the "full and final agreement between the parties" to the exclusion of any and all "prior or contemporaneous oral representations." Nor are there any "ambiguities" in the Agreement regarding the mortgage or note which require consideration of parol evidence "to clear up."

{¶80} The position of the majority opinion is that the November 14 Agreement is not integrated with respect to "the extent to which, the terms of the 1995 loan as set forth in the promissory note were superseded by the November 2013 agreement." *Supra* at ¶ 28. More specifically, "[t]here is no indication in the November 2013 agreement, nor in the documents therein referenced – the 1998 agreement and the 2007 judgment entry – as to the agreement between husband and wife underlying wife's $125,000 interest in the sale of husband's property." *Supra* at ¶ 30. Stated otherwise, because the November 2013 Agreement is silent with respect to the 1995 promissory note and the 2009 mortgage, parol evidence may be allowed to clarify the relationship between the November 2013 Agreement and this independent debt. The majority opinion's position,

Case No. 2025-A-0009

that parol testimony may be considered to expand the scope of an agreement beyond what the parties intended undermines the stability and finality of agreements. It is contrary to the principles that the prohibition of parol testimony is meant to preserve.

***The November 14, 2013 Agreement is Silent with respect to the 2009 Mortgage***

{¶81} The November 14, 2013 Agreement contains five "WHEREAS" paragraphs explaining the *raison d'être* of the Agreement:

> **WHEREAS**, JAMES FARMAKIS and JOSEPH BISCOTTI entered into a written agreement dated November 15, 1998 (hereinafter "Agreement") describing the nature of their interests in the real estate consisting of the former Conneaut Shores Golf Course containing approximately 73.287 acres of land and vacant real estate containing approximately 13.5125 acres of land near the golf course (hereinafter collectively referred to as "premises"); and

> **WHEREAS**, after the filing and maintenance of litigation between BISCOTTI and FARMAKIS, a Judgment Entry was issued on March 14, 2007 in the case captioned *Joseph Biscotti, et al. v. James Farmakis, et al., Ashtabula County Common Pleas Court, Case No. 2005 CV 823*[,] determining that BISCOTTI is entitled to a 10% interest in the remainder of the sale proceeds of the premises after ROSEMARY FARMAKIS is paid the first $125,000 of such sale proceeds; and

> **WHEREAS**, the March 14, 2007 Judgment Entry serves by operation of law as a judgment lien against the premises, and FARMAKIS is unable to sell or transfer any part of the premises without the release by BISCOTTI of said judgment lien; and

> **WHEREAS**, FARMAKIS and their contractor/developer have created and obtained regulatory approval for a Planned Unit Development ("PUD") at and on the premises which includes four phases of residential home development and divides part of the premises into 134 individual lots and separate sublots, open space and common areas (collectively referred to as "PUD property") …; and

> **WHEREAS**, FARMAKIS and BISCOTTI have reached an agreement, the terms of which are provided herein, that, among other things, terminates the BISCOTTI judgment lien

established by the aforementioned March 14, 2007 Judgment Entry on the premises and creates a new mortgage in favor of NANCY I. BISCOTTI against the PUD property …

{¶82} It has been remarked above and conceded by the majority opinion that the "November 2013 agreement does not expressly reference the 2009 mortgage." *Supra* at ¶ 50. Moreover, neither do the 1998 agreement or the 2007 judgment entry make any reference to the 2009 mortgage and underlying 1995 promissory note. *Supra* at ¶ 9 ("[t]here is no indication that the 1998 agreement provided any guidance as to why wife was to receive the first $125,000 in the event of sale of the Conneaut property") and ¶ 10 ("there is no indication in the judgment as to why husband and Joseph Biscotti agreed in 1998 that wife would receive the first $125,000 from the sale of the Conneaut property").

{¶83} In sum, the November 14 Agreement which is silent with respect to the 2009 mortgage is based on a 1998 agreement and 2007 judgment both of which are equally silent with respect to the 2009 mortgage. It is difficult to conclude, then, that the November 14 Agreement had anything to do with the 2009 mortgage and even more so to conclude that it *sub silentio* extinguished or modified the 2009 mortgage. If the November 14 Agreement is silent with respect to the 2009 mortgage, it is because the November 14 Agreement does not concern the 2009 mortgage. *Foster v. Foster*, 1980 WL 353971, *9 (Jul. 31, 1980 5th Dist.) ("[p]arol evidence may be employed to resolve ambiguities in a document, but not to resolve silence").

### *Expressio Unius Exclusio Alterius*

{¶84} This conclusion is further bolstered by the fact that the November 14 Agreement is not silent about extinguishing the 2007 judgment lien. As quoted above, the Agreement "terminates the BISCOTTI judgment lien established by the … 2007 Judgment Entry … and creates a new mortgage in favor of NANCY I. BISCOTTI against

Case No. 2025-A-0009

the PUD property." To this end, the Agreement also provides that "[t]he priority interest of ROSEMARY FARMAKIS in the sum of $125,000.00 as established by the Agreement and March 14, 2007 Judgment Entry in the remainder of the proceeds from the sale of the premises … is hereby extinguished and terminated by virtue of the agreement herein." Likewise, under the terms of the November 14 Agreement, Nancy was required to "execute … a Full and Final Release of any and all interest of the Estate of Joseph Biscotti in the premises as established by the Agreement and March 14, 2007 Judgment Entry." The Agreement is unequivocal in both its intent to extinguish and its actual extinguishment of the 2007 judgment lien.

{¶85} "Expressio unius est exclusio alterius is an interpretative maxim meaning that if certain things are specified in a law, contract, or will, other things are impliedly excluded." (Citation omitted.) *Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 2023-Ohio-3398, ¶ 24. Applied to the present case, the fact that the November 14 Agreement expressly terminates the 2007 judgment lien impliedly excludes the 2009 mortgage from termination. The Agreement's silence alone regarding the 2009 mortgage is sufficient to maintain that the mortgage was unaffected by it. Considering the background to the Agreement (as stated in the "whereas" paragraphs) and the express termination of the 2007 judgment lien by the Agreement, the conclusion that the Agreement has nothing to do with the mortgage is incontrovertible. Stated otherwise, if the Agreement did not extinguish the mortgage it should be presumed that the parties did not intend to extinguish the mortgage. *Compare id.* ("had the parties wanted to include a notice provision regarding indemnification for payment of a voluntary settlement, they knew how to do so and would have done so").

Case No. 2025-A-0009

### Parol Evidence is Neither Necessary nor Permissible to Interpret the November 14, 2013 Agreement

{¶86} Neither the lower court nor the majority opinion (nor the parties) claim ambiguity in the November 14, 2013 Agreement. The magistrate overruled the objection to the parol evidence on the spurious grounds that the testimony constituted permissible hearsay. Not only did the lower court misconstrue the rule concerning parol testimony as a rule of evidence rather than a substantive rule of law, but the magistrate gave no consideration at all to the integration clause discussed above.

{¶87} The majority opinion achieves the same result, *i.e.*, the impermissible consideration of parol testimony to supplement the parties' integrated agreement, by the device of interpreting the integration clause as only partially effective. In effect, the magistrate's approach is very similar to that taken by the majority opinion. Both find the silence in the November 14, 2013 Agreement with respect to the debt created by the promissory note and secured by the mortgage as a deficiency in the Agreement that requires supplementary testimony to explain. No explanation, however, is necessary.

{¶88} The reasons for Rosemary having a priority interest in the proceeds are the concern of the parties, not the courts. The parties chose to give Rosemary a priority interest. They chose not to explain why. It is not the business of the courts to speculate, but to enforce the agreements as they exist. Silence, as construed by the lower court and the majority opinion, could be used to destabilize any written agreement inasmuch as every written agreement is silent about the entire universe of things extraneous to the agreement.

{¶89} Moreover, it is worth considering the practical implications of the majority opinion's position for businesses which deal with multiple clients and multiple

Case No. 2025-A-0009

transactions. Any commonality among parties or subject matter could potentially be grounds for shoehorning extraneous provisions and understandings into any self-contained, integrated agreement. In the present case, the original $100,000 loan from Rosemary to James did not involve Biscotti in any way. Yet, because of a superficial similarity between the $100,000 loan and $125,000 priority interest, the November 14, 2013 Agreement which purports to resolve Biscotti's 2007 judgment lien is also implicated with the note and mortgage. If that is all that is necessary to introduce parol testimony, then it would be virtually impossible to ever have a fully integrated agreement; economic and contractual uncertainty would abound.

{¶90} As urged above, the best indicator that the November 14 Agreement did not replace or modify the 2009 mortgage (or the underlying 1995 promissory note) is the fact that the Agreement did not claim to do either of those things. Again, speculation is neither necessary nor proper where a plainly integrated contract exists. Nonetheless it is telling that the whole "whereas" preamble to the Agreement focuses on the 2007 judgment lien and the substantive provisions of the agreement only related to the 2007 judgment lien. The lien itself was based on an earlier 1998 agreement and neither the lien nor the 1998 agreement have any apparent connection with the mortgage and promissory note. This should be the end of the inquiry.

{¶91} However, according to the parol testimony of Christian Farmakis, a non-party to these proceedings who was not involved in and did not have direct knowledge of any of the underlying transactions, the $125,000 priority interest memorialized in the 2007 judgment lien is the "same debt" as the $100,000 mortgage executed in 2009. *Ergo*, by extinguishing the 2007 judgment lien the November 14 Agreement necessarily

Case No. 2025-A-0009

extinguished the 2009 mortgage as well despite no mention of doing so in any of the legal documents.

{¶92} The reasons why Christian's testimony should have been rejected may be stated succinctly. The November 14 Agreement is an integrated agreement. Christian's testimony supplements the Agreement by having it extinguish a mortgage that is neither mentioned in nor contemplated by the Agreement itself. There is no ambiguity on the face of the Agreement. Not only is the Agreement silent with respect to the mortgage but the transactions underlying the Agreement, *i.e.*, the 1998 agreement and 2007 judgment lien, are equally silent about the mortgage and the promissory note which it secures. The only evidence linking the November 14 Agreement, the 2007 judgment lien, and the 1998 agreement with the mortgage and promissory note is Christian's parol testimony, which, by the parol evidence rule, cannot legally be considered to demonstrate whether ambiguity exists in the first place.

### *The Impermissible Parol Testimony is Undermined by Other Documentary Evidence*

{¶93} A fully integrated contract provides economic certainty and precludes the need for such speculation. However, assuming, *arguendo*, that it was proper to consider Christian's parol testimony, that testimony is at variance with the written documents executed after the November 14 Agreement. Even if the testimony were admissible, it is not credible.

{¶94} On December 6, 2013, Nancy, James, and Rosemary executed an uncaptioned document which provides as follows:

> We, the undersigned, do further agree that both the mortgage lien of Rosemary Farmakis recorded on August 31, 2009, in Vol. 460, Pg. 595, Ashtabula County records; and the operation of the Judgment Entry of March 14, 2007, entered by the Court of Common Pleas in

case no. 2005 CV 823, *Joseph Biscotti, et al., v. James Farmakis, et al.*; are hereby fully released, satisfied and extinguished as to any property specifically designated as common elements or common areas in the plat of "The Shores-Phase I" as found recorded in Vol. 20, Pg. 40, Ashtabula County Plat Records. Nothing in this document shall impair the foregoing claims as to any other property unless specifically released by separate instrument.

{¶95} This document undermines Christian's testimony in a couple of ways. First, it recognizes that the 2009 mortgage and 2007 judgment lien are independently existing obligations and not "the same debt" as claimed by the parol testimony. Second, if the mortgage had been extinguished by the November 14 Agreement, there would be no reason to extinguish it again in December.

{¶96} Moreover, if Rosemary's priority interest in the first $125,000 from the proceeds from the sale of the Conneaut property merely represented James' promise to pay her $100,000, why would Biscotti agree to have that debt satisfied in the amount of $125,000 before his ten percent interest was calculated? Rosemary's priority interest in the Conneaut property decreased the value of Biscotti's ten percent interest. It is difficult to understand why Biscotti would accept such a condition if its only purpose was to satisfy a loan to James that did not involve Biscotti in some way.

{¶97} Finally, but importantly, the December 6 document is only a partial release of the mortgage, limited to the "common elements or common areas in the plat of 'The Shores-Phase I.'" The November 14 Agreement described the Conneaut property as comprising approximately 86 acres. The Preliminary Plan for The Shores – Phase 1 & 2, recorded with the November 14 Agreement, indicates that this phase of the development only encompasses about 13 acres.[6] Whatever was being released by the December 6

---

6. According to the "site data" in the Preliminary Plan: "Area in lots = 11.02 ± acres / Area in open space = 1.08 ± acres / Area in roadways = 1.02 ± acres / Total area = 13.12 ± acres."

Case No. 2025-A-0009

document comprised only a small fraction of the entire Conneaut property. With respect to the rest of that property, the document affirms that the claims of the 2009 mortgage are not impaired.

{¶98} The continuing validity of the 2009 mortgage is also evidenced by a number of Partial Releases of Mortgage executed by Rosemary between 2014 and 2016. The text of these releases is as follows:

> In return for the sum of $1,350.00 in hand received, the undersigned does hereby acknowledge and declare that a certain Mortgage dated August 27, 2009, filed for record on August 31, 2009, at Volume 460, Page 595, Ashtabula County Records, given by James Farmakis to secure payment of $100,000.00, is hereby satisfied and discharged only as to the premises known as:
>
> Sublot No. [lot number] in The Shores at Conneaut Planned Community, as shown in the plat of The Shores – Phase I, found recorded in Volume 20, Page 41 of the Ashtabula County Plat Records.[7]
>
> PPN: [permanent parcel number]
>
> The terms and conditions of said mortgage shall continue to apply to all other lands described therein.

{¶99} As with the December 6 document, these Partial Releases acknowledge the continuing validity of the mortgage, release the claims of the mortgage to a limited portion of the Conneaut property, and affirm the continuing validity of the mortgage as to the remainder of the property. It is impossible to reconcile these Releases with the propositions that the November 14 Agreement extinguished the mortgage or that the mortgage debt was the same debt represented by the 2007 judgment lien which was extinguished by the Agreement.

---

7. Certain Releases contain the following additional language at this point: "and … Any and all common elements described in The Shores Planned Unit Development, as currently platted in Phase I, and as may be hereafter amended."

Case No. 2025-A-0009

{¶100} Contrary to the majority, I do not believe that the December 6 document and the Partial Releases of Mortgage "indicates that the debt underlying both the mortgage and the November 2013 agreement was the same" or that "the parties intended to revise their prior agreements as to the husband's repayment of the debt to wife." *Supra* at ¶ 54. The December 6 document distinguishes the two debts and it is simply not possible to infer or deduce from the Partial Releases what the parties' intentions may have been regarding satisfaction of the mortgage. Nor is that a question that the courts should be considering to the extent that it involves parol testimony. The same weight of the evidence standard applied against the conclusion that the debt was satisfied weighs against the conclusion that the two obligations were the "same" debt.

### *The November 14, 2013 Agreement did not Revise the Terms of the Mortgage*

{¶101} The majority opinion takes the position that the trial court's finding the November 14, 2013 Agreement "extinguished" or "terminated" the 1995 promissory note and 2009 mortgage was against the weight of evidence. It would follow, then, that the 2009 mortgage continues to be valid. However, the majority opinion asserts that "the prior agreements of husband and wife relative to the 1995 loan [*i.e.*, the promissory note and mortgage] were replaced … insofar as they were inconsistent with the terms of the November 2013 agreement." *Id.* Bearing in mind that the November 2013 Agreement is silent regarding the promissory note and mortgage, the possibility of inconsistency in the contract terms of the two documents would appear minimal (it appears no such inconsistency is identified by this court).

{¶102} The note provides that it becomes payable upon the death of James and the mortgage adopts the terms of the note. The conditions for acceleration of the note

Case No. 2025-A-0009

are not inconsistent with the terms of the November 2013 Agreement. Rosemary made a demand in December 2018 and the debt has not been paid. She is entitled to foreclose.

{¶103} The majority opinion concludes that the November 2013 Agreement revised the terms of repayment of the mortgage based, not on anything contained in the Agreement, but on the Partial Releases of Mortgage. The majority opinion states that "[t]here is no evidence of default on the revised terms of repayment." *Supra* at ¶ 54. Indeed, there is no evidence of what these revised terms actually are. In fact, none of the agreements between the parties actually states or claims that the terms of repayment have been revised (neither did Christian Farmakis in his testimony). Rather, the Partial Releases reference the 2009 mortgage without indicating any alteration in the terms and conditions of the mortgage: "The **terms and conditions** of said mortgage shall continue to apply to all other lands described therein." (Emphasis added.)

{¶104} It could be argued that testimony of a debt being satisfied is categorically different than testimony that an oral agreement partially satisfied/modified a written obligation. It should be recognized that, although the focus has been on the November 14, 2013 Agreement, Rosemary's claims are based solely on the promissory note and mortgage. The November Agreement is raised in defense to argue that the note and mortgage have been satisfied or are otherwise unenforceable.

{¶105} Whether satisfied or modified, there should be some evidence in writing to support such a conclusion. The unmodified mortgage remains an encumbrance of record on the property. The November Agreement does not claim to satisfy or modify the mortgage. The subsequent agreements (the December Agreement and the Partial Releases) attest the limited and partial satisfaction of the mortgage in such a way that the

Case No. 2025-A-0009

right to foreclose is not compromised. Despite this limited and partial satisfaction, there is no evidence that the terms of repayment have been altered. In sum, the silence of the November Agreement does not support any attempt to argue for the modification of the mortgage.

### *The Integrity of Written Instruments Favors Predictability and Stability over Speculation*

{¶106} Ultimately, the majority opinion's attempt to justify the trial court's judgment on the grounds that "the terms of the November 2013 agreement superseded the terms of the promissory note" is no more convincing than the trial court's claim that the November Agreement satisfied the promissory note, particularly in light of a contract which on its face contains a full integration clause. In the five "whereas" paragraphs, the parties set forth in detail the reasons for and the purposes of the November Agreement. Modification (or even acknowledgement) of the promissory note was not among them. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Galatis*, 2003-Ohio-5849, at ¶ 11.

{¶107} As argued above, the primary responsibility of the courts is to enforce agreements as written by the parties, not to rewrite them based on speculation as to what the parties might have intended. This principle also underlies the purpose of the parol evidence rule "to ensure the stability, predictability, and enforceability of finalized written contracts." *Williams*, 2009-Ohio-3554, at ¶ 21; *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 440 (1996). Today's holding upends these principles not only with respect to the promissory note and mortgage but also the November 14 Agreement. The note is expressly guaranteed by the mortgage, not by the 2007 judgment entry or November 14 Agreement.

Case No. 2025-A-0009

{¶108} Although it is possible to disagree with the majority opinion's factual assessment, such factual speculation based on legally incompetent third-party testimony misses the forest for the trees. The factual analysis distracts from a much more fundamental legal principle: extrinsic evidence, even if wholly credible, should not be considered in derogation of the parties' written agreements.

{¶109} Even if the majority opinion's analysis of the parol testimony were correct in establishing that a $100,000 debt created in 1995 at 10% *per annum* is now secured by an arrangement whereby Rosemary will ultimately receive a $180,900 payout, simply to engage in the analysis to reach this conclusion disregards well-established legal rules regarding the competence of parol evidence. That factual engagement, without more, is sufficient to compromise the contractual and legal framework which ought to govern the outcome of this and any similar cases.

{¶110} Assuming, *arguendo*, that this court's speculation that the $100,000 loan was the same debt as the $125,000 priority interest is actually correct, fair, or even just, nonetheless, the precedential value as to all contracts requires that we abide by the terms of clearly written instruments. If the parties had desired otherwise, they had over fifteen years to arrange matters accordingly in a subsequent writing. A satisfaction or modification of the mortgage could have been filed. The promissory note could have been delivered. The fact that none of the actions legally necessary to satisfy or modify the terms of the note and mortgage is confirmation that it was not the parties' intent to do so. Where a contract is clear and unambiguous, the law requires courts to look no further to discern the parties' intent.

Case No. 2025-A-0009

*Conclusion*

{¶111} For the foregoing reasons, the parol evidence rule deems that the only relevant intent of the parties, as a matter of law, is that expressed in their written agreements. Neither the deceased James nor the incompetent Rosemary nor the deceased Biscotti are able any longer to explain intentions. To hold that their written intentions may be modified through extrinsic evidence years after the agreements were executed invites a degree of uncertainty into what ought to be among the very most certain areas of the law and the economic and contractual reliability that it provides.

{¶112} The November 14 Agreement is clear and unambiguous and should be construed as drafted. Moreover, inasmuch as the terms of the 2009 mortgage have been broken, Rosemary is entitled to the foreclosure of the same. I respectfully dissent.

Case No. 2025-A-0009

**JUDGMENT ENTRY**

For the reasons stated in the opinion of this court, appellant's first, second, third, and fifth assignments of error are without merit, and appellant's fourth assignment of error is rendered moot. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

 

_____

JUDGE EUGENE A. LUCCI

 

_____

JUDGE ROBERT J. PATTON,
concurs

 

_____

JUDGE SCOTT LYNCH,
dissents with a Dissenting Opinion

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.